Fletcher CASEY, et al., Plaintiffs,

v.

Samuel A. LEWIS, et al., Defendants.

Nos. CIV 90–0054 PHX CAM, CIV 91–1808 PHX CAM.

United States District Court, D. Arizona.

April 5, 1993.

See also 773 F.Supp. 1365.

Alice Loeb Bendheim, Phoenix, AZ, Adjoa A. Aiyetoro, Stuart Henry Adams, Jr., and David Cyrus Fathi, Nat. Prison Project of America, Civ. Liberties Union Foundation, Washington, DC, for plaintiffs.

1. Defendants' Exhibit 670.

2. Stipulation, p. 26.

3. Stipulation, p. 26.

Kathleen L. Weinecke and Daniel Struck, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MUECKE, District Judge.

### ACCESS FOR THE HANDICAPPED INMATES

Having considered the evidence presented by the parties relevant to the access for the handicapped issues in this case, the Court concludes as follows:

### *Background*

Plaintiffs allege that defendants discriminate against handicapped inmates in violation of Section 504 of the Rehabilitation Act of 1973. Plaintiffs further allege that the defendants' failure to provide accommodations for handicapped inmates violates their eighth amendment rights to be free from cruel and unusual punishment.

### *Findings of Fact*

**I. *Mobility Impaired Prisoners***

**A. ADOC houses mobility impaired inmates.**

A number of Arizona prisoners are confined to wheelchairs, have artificial limbs, are partially paralyzed, or are otherwise limited in their mobility.[1] As of March 16, 1990, there were 20 prisoners confined to wheelchairs, 33 who had artificial limbs and 15 who were partially paralyzed. These inmates were housed throughout the system.[2] As of August 19, 1991, there were 25–30 wheelchair-bound prisoners confined in Florence.[3] No ADOC staff person is monitoring facilities for the handicapped on a system-wide basis.[4]

4. Keency deposition, November 14, 1990, p. 84, lines 23–25.

**B. Accessibility of facilities to mobility impaired prisoners.**

**1. Florence**

The health unit and law library are handicap accessible.[5] ADOC has recently completed several modifications in the Florence complex to accommodate mobility-impaired prisoners.[6]

**a. SMU**

The health unit and law library are handicap accessible. The cells at SMU do not have accommodations for the handicapped inmates. Handicapped prisoners are escorted to the health unit for their baths.[7]

**b. Women's Division**

The law library and program areas are handicap accessible. One living unit is being renovated to be handicap accessible. The renovations are being made in accordance with the recommendations from the Central Arizona Health Institute. At the time the parties entered the stipulation, there was one woman in the facility who ambulated with a walker.[8]

**c. East Unit**

The dining hall, law library visitation area and hobby shop were made handicap accessible in 1990. The Health Unit is handicap accessible. As of August 20, 1991, there were no wheelchair-bound prisoners in the facility. Easy cluster is utilized for wheelchair-bound prisoners. The shower in Easy Cluster has a chair with wheels and a handrail, but has no anti-slip flooring. The bathroom also has a handrail. The lockdown unit is not accessible to the handicapped.[9]

**d. North Unit**

There are some inmates with prostheses in this unit. The law library in North Unit is handicap accessible.[10]

**e. South Unit**

As of August 19, 1991, there were nine wheelchair-bound prisoners in the South Unit in Florence. At this time, the unit had no handicap access structures such as handrails, ramps, or anti-slip flooring in the shower and bathroom areas. Wheelchair-bound prisoners were required to pull themselves up on a wall and over a ledge to get into the shower and onto a chair, which is placed in the shower.

All living and program areas are on the ground floor and accessible to handicapped prisoners.[11] In November of 1991, ADOC modified the dormitory to accommodate 18 handicapped inmates.[12]

**f. Central Unit**

All of the handicapped inmates residing in Central Unit are now housed in the infirmary or Housing Unit 8.[13] In 1991, defendants developed a plan for handicapped access in Central Unit, specifically to make modifications to Housing Unit 8. Although scheduled to be completed by July of 1991, the work was delayed.[14]

**g. CB6**

At CB6, the showers and bathrooms are not accessible to the handicapped. The health unit and law library are handicapped accessible.[15]

**h. Rynning Unit**

The Rynning Unit at Florence is not accessible to handicapped inmates. According to staff, handicapped inmates are transferred to Central Unit.[16]

---

5. Stipulation, p. 24.

6. Keeney testimony, 1/27/1992, p. 58, line 22—p. 59, line 3.

7. Stipulation, p. 24, § II.A.2.

8. Stipulation, p. 25, § II.A.3.

9. Stipulation, p. 25, § II.A.5.

10. Stipulation, p. 25, § II.A.5.

11. Stipulation, p. 26, § II.A.7.

12. Keeney testimony, 1/27/1992, p. 59, lines 12–22.

13. Cory testimony, 1/14/1992, p. 27, line 20—p. 28, line 1.

14. Stipulation, p. 26, § II.A.8.

15. Stipulation, p. 24, § II.A.1.

16. Stipulation, p. 26, § II.A.6.

### 2. Phoenix

#### a. Alhambra

At Alhambra, ADOC staff consulted with the Easter Seals Foundation to determine how to accommodate physically handicapped prisoners. The health unit, law library and occupational therapy areas are handicap accessible. On August 12, 1991, showers are equipped with rails and a rubber tip chair. The Alhambra facility has no anti-slip flooring in the bathrooms and showers. However, defendants have ordered risers for toilet seats.[17] Two rooms in the reception unit in Alhambra are equipped for handicapped inmates.[18]

The upper floors of Baker Ward and Flamenco are not accessible to handicapped inmates. One room for two prisoners in B Ward is equipped for handicapped inmates. Also in B Ward, the shower is handicap accessible and a riser has been ordered for the toilet.[19]

#### b. ACW

The health unit and program areas, including the law library, are accessible to handicapped inmates. There is one room with two double bunks that has been retrofitted with a handrail and anti-slip strips in the shower and a handrail in the toilet. There is no anti-slip flooring on the floor around the shower area.[20]

### 3. Douglas

Douglas occasionally houses inmates who are crutch-bound or have prosthesis. All buildings, except for administration, are single level structures. The law libraries are handicap accessible. All shower floors are currently being provided with anti-slip material (rockite). There are no handrails in the showers or toilet areas.[21]

### 4. Winslow

The Winslow facility does not house inmates with physical handicaps and is generally not accessible to handicapped inmates. All visiting and public areas are handicap accessible. The law library is also handicap accessible. In September of 1990, ADOC installed non-slip floors inside and outside of the showers. When the prison was constructed, ADOC installed handrails in the showers and no-slip floors in the shower areas of the general population units.[22]

### 5. Tucson

#### a. Rincon Unit

ADOC has housed wheelchair-bound, crutch-bound, and partially blind inmates in the Rincon Unit. The bathrooms have had anti-slip floors since 1981. But there are no rails in the bathrooms and showers. All program units and living areas on the ground floor are accessible to handicapped prisoners.[23]

#### b. Echo Unit

The Echo Unit is not intended to house handicapped inmates. Inmates are assigned to a housing unit before the staff know of any special needs. Once those needs are learned, staff attempts to accommodate handicapped inmates. The Unit has ramps to the control unit and commissary that were constructed in 1989. In 1988, ADOC installed anti-slip flooring and a handrail in the shower in Dorm 3. A chair is available in Dorm 3 for handicap showering.[24]

#### c. Santa Rita Unit

One of the housing units at Santa Rita has a ramp to the cells and handrails in the shower that were installed prior to the filing of this action. The shower has no anti-slip flooring. None of the cells have specialized toilets.[25]

---

17. Stipulation, p. 27, § II.B.

18. Stipulation, p. 27, § II.B.

19. Stipulation, p. 27, § II.B.

20. Stipulation, p. 31, § II.G.

21. Stipulation, p. 27, § II.C.

22. Stipulation, p. 28, § II.D.

23. Stipulation, p. 28, § II.E.1.

24. Stipulation, p. 29, § II.E.2.

25. Stipulation, p. 29, § II.E.3.

### d. Cimarron Unit

At the Cimarron Unit, the cellblock has two tiers and there is no ramp leading to the upper tier. This unit has housed inmates with prosthetics. However, the staff will transfer inmates to the Rincon Unit if they experience difficulties. The dining area, barber shop, commissary, disciplinary hearing room and school are on the first floor, which is accessible to handicapped prisoners. ADOC staff have purchased anti-slip strips for the shower area. Neither the showers nor toilets have handrails.[26]

### 6. Perryville

Wheelchair-bound inmates are transferred out of the facility. However, the facility houses inmates with prothesis or who are otherwise physically challenged. The health unit is accessible on the ground level. The law libraries, showers and bathrooms are not accessible to the handicapped inmates. Some of these prisoners are transported by electric cart and assisted into and out of the libraries.[27]

### C. Impact of inaccessible facilities.

**1. Inaccessible facilities have deprived handicapped inmates of basic human needs including use of the shower, use the toilet, and receipt of medical care.**

George Curly is a prisoner with a below-knee leg amputation who uses crutches and has a prothesis.[28] While he was housed in the Echo Unit in Tucson between 1989 and 1990, there were no handrails in the shower and Mr. Curly repeatedly fell in the shower. In addition, while he was at Echo Unit between 1989 and 1990, the dining hall had no facilities to assist prisoners with crutches, such as carts to help them carry their meals to the table.[29] Echo Unit now has rails in the shower. Those rails were installed some time in 1990.[30]

David Murphy is another handicapped inmate who is confined in a wheelchair and has been housed in facilities without handicapped access.[31] While he was housed at Alhambra, Mr. Murphy was unable to bathe for four days because there were no bathing facilities for handicapped inmates.[32] Alhambra is now handicap accessible as the showers are equipped with rails and a rubber-tipped chair.[33]

While Mr. Murphy was housed in CB3 in Central Unit in Florence in 1989, sick call was held upstairs, an area that was inaccessible to prisoners in wheelchairs.[34] At this time, ADOC housed approximately six other inmates in wheelchairs, in addition to Mr. Murphy, in CB3.[35] For approximately a six-month period in 1989 and 1990, staff told inmates in wheelchairs to wait in front of the guard gate at sick call. However, at this time, officers told him several times that they would give him a disciplinary write-up if he remained in front of the guard cage. So, he returned to his cell. As a result, during this period, he was not always seen by medical staff when he went to sick call.[36]

While Mr. Murphy was confined in Central Unit in Florence, his cell door was too nar-

---

26. Stipulation, p. 30, § II.E.4.

27. Stipulation, p. 30, § II.F.; See also Plaintiffs' Exhibit 249 (September 21, 1990 statement by Facility Health Administrator Jim Charles that Perryville is not equipped for prisoners who use a wheelchair or crutches all the time).

28. Bryan testimony, 12/17/1991, p. 96, line 11— p. 97, line 1.

29. Bryan testimony, 12/17/1991, p. 98—p. 100, line 7.

30. Bryan testimony, 12/17/1991, p. 102, line 21— p. 103, line 1.

31. Inmate Murphy is not a named plaintiff and was released from prison on parole in November of 1991. Murphy testimony, 12/18/1991, p. 10, lines 9–13.

32. Murphy testimony, 12/18/1991, p. 35, line 25—p. 36, line 5.

33. Stipulation, p. 27.

34. Murphy testimony, 12/18/1991, p. 13, lines 10–14.

35. Murphy testimony, 12/18/1991, p. 13, lines 15–17.

36. Murphy testimony, 12/18/1991, p. 13, line 22—p. 16, line 2.

row to accommodate his wheelchair.[37] Therefore, to enter his cell he was required to leave his wheelchair outside, pull himself into the cell by the bars and let himself down on the bed.[38] On one occasion, he refused a medical appointment because he was in too much pain to move from his cell to his wheelchair outside the cell door.[39] On this occasion, Mr. Murphy asked an officer to help him to his wheelchair, but the officer refused to help.[40] Because sick call in Central Unit is now conducted by using the self-referral form, this problem probably should not reoccur in Central Unit.[41]

When he was housed in CB3 at Central Unit in Florence, Mr. Murphy could not use the shower. Rather, he traveled approximately one hundred yards outdoors to bathe in Housing Unit 8.[42] His cell had no rails so that he could pull himself on and off of the toilet.[43]

Inmate Murphy did have access to the law library in Central Unit.[44]

Roman Stone is a prisoner who is partially paralyzed, and cannot walk without a leg brace. He is also legally blind.[45] He is no longer capable of showering, but was capable of showering in the past. At that time, he was unable to use the shower at SMU in Florence because there were no chairs, handles or other appliances to assist him. He has fallen while in the shower.[46] When he was housed in CB6 in Florence, he was allowed to use a chair to shower. However, he still fell. Although he requested additional equipment to help him use the shower, his request was denied.[47]

### 2. Handicapped prisoners have sometimes been unable to obtain special equipment, repairs to that equipment or care necessary for their disabilities.

For example, David Murphy was unable to have all of the necessary repairs and maintenance performed on his wheelchair in Central Unit.[48] Defendants replaced the ball bearings in the wheelchair at some point during his stay in Central Unit.[49] However, by the time he left Central Unit, the chair was almost "inoperable." [50]

Another inmate, Frank Bartholic, had his leg brace confiscated for security reasons when he was transferred from SMU in Florence to Winslow. Because his leg kept "buckling" without the brace, he had difficulty walking and standing.[51]

Joe Harris is a prisoner whose ID card identifies him as an epileptic. However, when he was transferred to Perryville in 1990, he was assigned to a top bunk at Perryville despite his protests that his condi-

---

37. Murphy testimony, 12/18/1991, p. 36, lines 6–14. During his stay in Central Unit, he periodically walked with crutches, rather than being wheelchair-bound. Murphy testimony, 1/14/1992, p. 30, lines 8–24.

38. Murphy testimony, 12/18/1991, p. 36, line 22—p. 37, line 5.

39. Murphy testimony, 12/18/1991, p. 29, lines 9–17.

40. Murphy testimony, 12/18/1991, p. 29, line 18—p. 30, line 1.

41. *See* Findings of Fact and Conclusions of Law for Medical, Dental and Mental Health care issues.

42. Murphy testimony, 12/18/1991, p. 36, lines 15–22.

43. Murphy testimony, 12/18/1991, p. 37, line 25, p. 38, lines 1–2.

44. Murphy testimony, 12/18/1991, p. 46, line 20—p. 56, line 3.

45. Stone testimony, 12/19/1991, p. 9, line 24—p. 10, line 13; Defendants' Exhibit 616, p. 017364.

46. Stone testimony, 12/19/1991, p. 12, lines 1–21; Defendants' Exhibit 616, 1/3/90.

47. Stone testimony, 12/19/1991, p. 12, lines 22–19.

48. Murphy testimony, 12/18/1991, p. 39, line 25—p. 40, line 17.

49. Murphy testimony, 12/18/1991, p. 56, lines 4–6.

50. Murphy testimony, 12/18/1991, p. 39, line 25—p. 40, line 17.

51. Bartholic testimony, 12/17/1991, p. 197, line 24—p. 198, line 9.

tion required a bottom bunk.[52] While sleeping in the top bunk, he had a seizure and fell out of the bunk, injuring his head and back.[53] Defendants moved inmate Harris to a lower bunk the same day that the incident occurred.[54] Pursuant to defendants' procedure, inmates who are epileptic are issued an ID card identifying them as epileptic so that they will be assigned to lower bunks.[55]

In another instance, a Perryville–San Pedro prisoner received leg prosthesis and stump socks seven weeks after his initial request.[56] The special prothesis was made by a private contractor, outside of the prison.[57] The defendants provided the inmate with crutches during the seven week period.[58]

### D. Changes since the filing of this action.

After the filing of this action in approximately May of 1990, a study was done regarding access for prisoners in wheelchairs at the Florence Complex.[59] As a result, ADOC has planned modifications in South Unit, Women's Unit and Housing Unit 8 in Florence.[60] ADOC plans to make one unit of each custody level accessible to the handicapped and concentrate handicapped prisoners in those units.[61] At the Florence wardens' meeting on October 17, 1990, Facility Health Administrator Norrish stated that making the facilities accessible to the handi-

capped inmates would require "simple modification in most areas." [62]

Some of the recommendations of the study are not being implemented due to fiscal constraints.[63] At the time of trial, defendants were expanding Housing Unit 8 to two modular units and the women's division renovations were complete.[64] Although the study specifically discussed Central Unit in Florence, ADOC had made no modifications to that unit as of June of 1991.[65] Similarly, in 1991, ADOC had not implemented the changes recommended in the East Unit in Florence.[66] Although the modifications to Housing Unit 8 in Florence were scheduled to be finished in July 1991, those modifications were not completed by the time of Mr. Norrish's trial testimony in January of 1992.[67]

At the time of trial, ADOC had completed some of the renovations. ADOC expended $1,575.79 to make South Unit in Florence accessible. The modifications required 19 hours of staff overtime and 36 hours of prisoner overtime.[68]

### II. Visually and Hearing Impaired Prisoners

#### A. ADOC houses visually and hearing impaired prisoners.

There are visually and hearing impaired inmates in the Arizona Department of Cor-

---

**52.** Harris testimony, 12/18/1991, p. 211, line 6—p. 212, line 16.

**53.** Harris testimony, 12/18/1991, p. 212, line 17—p. 213, line 5; Defendants' Exhibit 582, p. 009730, note 9/27/90.

**54.** Harris testimony, 12/18/1991, p. 223, lines 5–7.

**55.** Plaintiffs' Exhibit 305.

**56.** Plaintiffs' Exhibit 32t, notes 12/14/1990, 12/18/90, 1/3/91, 2/17/91, and 2/15/91.

**57.** Plaintiffs' Exhibit 32t, notes 1/3/1991, 2/5/91.

**58.** Plaintiffs' Exhibit 32t, note 12/14/90.

**59.** Norrish testimony, 1/8/1992, p. 102, lines 18–23; p. 103, lines 16–18.

**60.** Norrish testimony, 1/8/1992, p. 81, line 6—p. 82, line 9; Stipulation, pp. 25 and 26.

**61.** Stewart testimony, 1/16/1992, p. 58, lines 12–20; Stipulation, p. 23.

**62.** Plaintiffs' Exhibit 279, 10/17/90, p. 2.

**63.** Norrish testimony, 1/8/1992, p. 103, lines 8–15.

**64.** Norrish testimony, 1/8/1992, p. 103, line 19—p. 104, line 1.

**65.** Norrish testimony, 1/8/1992, p. 104, lines 2–17.

**66.** Norrish testimony, 1/8/1992, p. 104, line 8—p. 105, line 1.

**67.** Norrish testimony, 1/8/1992, p. 105, lines 2–4; Stipulation, p. 26.

**68.** Defendants' Exhibit 916 (memo 10/15/91).

rections. As of March 16, 1990, ADOC housed 61 hearing impaired prisoners and 24 blind prisoners at several facilities throughout the state.[69] However, ADOC did not include the needs of these inmates in the general study regarding access for handicapped inmates.[70] The 1990 study of the needs of handicapped prisoners at Florence focused only on prisoners confined to wheelchairs.[71] Any evaluations that have been done related specifically to an individual prisoner.[72]

### B. Special needs of visually and hearing impaired inmates.

Plaintiffs allege that because defendants have not developed a systematic program for meeting the special needs of visually impaired prisoners, those prisoners' need are not met.

### 1. Hearing impaired inmates

Plaintiffs presented numerous examples of inmates who experienced delays in receiving hearing aids. A prisoner at Perryville complained of hearing loss and was referred for an audiogram on November 29, 1990. The outside review committee approved the consult two months later, but it was apparently never done.[73]

A prisoner at Florence complained of hearing loss on August 18, 1990. Medical staff referred him to a provider. However, there was apparently no follow-up on his hearing problem.[74]

Another Florence prisoner complaining of an ear infection was found to have hearing loss in one ear. Staff ordered an ENT (ear nose, and throat) referral in June of 1990.[75] In October, the prisoner returned to medical, requesting hearing aids, claiming he had previously had problems getting hearing aids in from outside the prison for two years.[76] Later that month, his chart was referred to a staff person to attempt to get hearing aids.[77] The ENT consult finally occurred on December 27, six months after it had been ordered. At that time, it was decided that the prisoner did not need hearing aids, but might at some later date.[78]

A prisoner at the Santa Rita Unit in Tucson complained of hearing loss in April of 1990.[79] An audiogram in June confirmed hearing loss, but no treatment was prescribed.[80] In November of 1990, a specialist consult recommended that the prisoner receive a hearing aid. However, the outside review committee did not approve the hearing aid. Rather, the committee ordered that the audiogram be repeated in six months for comparison.[81]

On July 6, 1990, an ADOC physician diagnosed a Tucson prisoner as suffering from "severe high frequency hearing loss" and ordered an audiology consult.[82] The consult did not occur until November 1, 1990, nearly four months later.[83] The consult recommended "binaural amplification ASAP."[84] However, instead of following this recommendation, the review committee recommended that the prison be tested in three

**69.** Defendants' Exhibit 670.

**70.** Norrish testimony, 1/8/1992, p. 102, line 24—p. 103, line 7.

**71.** Norrish testimony, 1/8/1992, p. 102, lines 18–23.

**72.** Norrish testimony, 1/8/1992, p. 102, line 24—p. 103, line 7.

**73.** Plaintiffs' Exhibit 33i, notes 11/19/90, 11/29/90, 1/25/91.

**74.** Plaintiffs' Exhibit 30q, note 8/18/90.

**75.** Plaintiffs' Exhibit 30v, notes 3/1/90, 4/20/90, 6/18/90.

**76.** Plaintiffs' Exhibit 30v, note 10/15/90.

**77.** Plaintiffs' Exhibit 30v, note 10/23/90.

**78.** Plaintiffs' Exhibit 30v, note 12/27/90.

**79.** Plaintiffs' Exhibit 39e, note 4/10/90.

**80.** Plaintiffs' Exhibit 39e, notes 6/26/90, 7/2/90.

**81.** Plaintiffs' Exhibit 39e, notes 10/30/90, 11/1/90, 11/5/90, 11/13/90.

**82.** *Plaintiffs' Exhibit 36b, note 7/6/90, consult request 7/6/90.*

**83.** Plaintiffs' Exhibit 36b, note 11/1/90, consult report 11/1/90.

**84.** Plaintiffs' Exhibit 36b, note 11/1/90.

months "for comparison." [85] Although the inmate's hearing was retested in mid-February of 1991, the test results could not be found in record.[86] As of March 25, 1991, the prisoner still had not received his hearing aids.[87]

A prisoner had an audiogram in Florence on November 22, 1989, which showed "moderate to severe" hearing loss.[88] The inmate was transferred to the Santa Rita Unit in Tucson and an intake assessment was performed on June 30, 1990. However, the hearing problem was not noted.[89] On July 2, 1990, the prisoner requested attention for his hearing problem.[90] An audiology consult was ordered on July 10, 1990, but not performed until November 1, 1990.[91] The audiologist recommended binaural hearing aids.[92] However, the outside review committee recommended another audiogram in six months.[93]

### 2. Visually impaired inmates

Plaintiffs presented an example of a legally blind inmate in ADOC, Roman Stone at SMU, to establish that legally blind inmates have difficulty in getting their special needs met because of their blindness.[94]

On April 3, 1989, ADOC had inmate Stone evaluated by the Arizona Institute for the Partially Sighted.[95] The consultant recommended (1) recordings for the blind student and GED preparatory tapes; (2) talking books from the State Library for the Blind; and (3) Sun Sounds Radio Reading Service for the Blind.[96] ADOC had provided the GED tapes prior to this recommendation.[97] Defendants also provided inmate Stone with "talking books" from the State Library for the Blind.[98] Defendants have made available to inmate Stone a catalog listing equipment that is available for blind inmates, if they wish to place an order.[99] ADOC also provided inmate Stone with a Sun Sounds radio—a radio for blind persons, over which broadcasters read newspapers and other information. However, approximately one month after he received the radio, security staff removed the antenna and the radio no longer worked properly. Inmate Stone sent it to the property room to be replaced, but he never received a replacement unit.[100]

A few years ago, defendants had inmate Stone evaluated by an individual with the National Federation of the Blind.[101] Defendants provided all the recommendations, including the tape recorder, cane and instructions on how to assist inmate Stone in cleaning his cell.[102]

In March of 1989, a consultant, Dr. Szuter examined inmate Stone and recommended that he be considered for a vocational rehabilitation program.[103] However, ADOC has never placed Mr. Stone a formal rehabilita-

---

85. Plaintiffs' Exhibit 36b, note 11/15/90.

86. Plaintiffs' Exhibit 36b, note 2/20/91.

87. Plaintiffs' Exhibit 36b, note 3/25/91.

88. Plaintiffs' Exhibit 36d, consult request 7/10/90.

89. Plaintiffs' Exhibit 36d 6/30/90.

90. Plaintiffs' Exhibit 36d, note 7/2/90.

91. Plaintiffs' Exhibit 36d, notes 7/10/90, 11/1/90.

92. Plaintiffs' Exhibit 36d, note 11/1/90, consult report 11/1/90.

93. Plaintiffs' Exhibit 36d, note 11/15/90.

94. Defendants' Exhibit 616, p. 017271; Stone testimony, 12/12/19/1991, p. 8, line 10—p. 10, line 13.

95. Stone testimony, 12/19/1991, p. 17, lines 17–23; Defendants' Exhibit 616, p. 017498.

96. Defendants' Exhibit 616, p. 017498.

97. Stone testimony, 12/19/1991, p. 18, line 23—p. 19, line 2.

98. Stone testimony, 12/19/1992, p. 17, lines 11–20, p. 18, line 22—p. 19, line 21.

99. Stone testimony, 12/19/1991, p. 52, lines 4–7.

100. Stone testimony, 12/19/1991, p. 48, line 12—p. 49, line 9.

101. Upchurch testimony, 1/8/1992, p. 114, lines 8–23.

102. Upchurch testimony, 1/8/1992, p. 115, lines 3–9.

103. Defendants' Exhibit 616, p. 017499.

tion program.[104] ADOC has provided assistance in learning braille from Lisa Valdez of the Institute for the Blind in Kansas City, Kansas.[105] Inmate Stone has also been in contact with the Institute for the Blind in Kansas City, Kansas and has received cassette tapes for the blind from Newsweek, Arizona Religious Library and an organization called CMLS in Florida.[106] The Department of Economic Security in Phoenix has also provided him tapes for blind individuals.[107]

Because of his disability, inmate Stone has difficulty moving about his cell. On one occasion, in 1990, he slipped in water and fell in his cell. On another occasion, he stepped on an electrical cord in his cell and received a shock.[108]

Pursuant to policy, inmate Stone has been ordered to clean his cell.[109] ADOC policy prohibits officers from providing physical assistance to prisoners in cleaning their cells.[110] On one occasion, in April of 1990, CSO Rash helped inmate Stone clean his cell by telling him where the dirt was located in the cell.[111] The specialist from the National Federation of the Blind, who examined inmate Stone, stated that it was not unreasonable to require inmate Stone to clean his own cell because the area was small enough that he could memorize the location of items within the cell.[112]

Because of his blindness, inmate Stone is unable to inspect his food thoroughly. In SMU, the highest security facility, inmates are fed in individual cells. Because the trays are not marked, inmates cannot look at a food tray and know which inmate will receive that tray. ADOC has made an effort to prepare and deliver clean food trays to inmate Stone. Food trays were prepared from bulk serving containers onto trays under supervision of correctional officers in the kitchen and loaded onto several transport carts. These carts were pushed by officers in the living areas and the food was taken out and served to the inmates by officer.[113] However, inmate Stone states that he has still found foreign objects, including dirt, lint and a dead mouse, in food approximately 25 to 30 times since he has been at SMU.[114] On June 12, 1991, inmate Stone's breakfast tray included an apple with a razor blade embedded in it, which inmate Stone found only because he nicked his finger.[115] The officer completing the incident report noted that this was not the first incident.[116] Inmate Stone showed the apple to staff, but no one ever spoke with him about the incident.[117] Since that occasion, inmate Stone has found dirt, hair or lint in his food[118] and has reported these inci-

104. Stone testimony, 12/19/1991, p. 21, lines 9–24.

105. Stone Testimony, 12/19/1991, p. 51, lines 6–17.

106. Stone testimony, 12/19/1991, p. 51, lines 22–24.

107. Stone testimony, 12/19/1991, p. 51, lines 22–24.

108. Stone testimony, 12/19/1991, p. 11, line 17—p. 14, line 22; Defendants' Exhibit 616, p. 017248, note 1/4/90, p. 017052, p. 017050, notes 9/18/90, 9/20/90.

109. Defendants' Exhibit 923 (incident report, 1/10/90); Stone testimony, 12/19/1991, p. 15, line 23—p. 16, line 7.

110. Rash testimony, 1/13/1992, p. 126, line 24—p. 127, line 1.

111. Stone testimony, 12/19/1991, p. 128, lines 9–15.

112. Upchurch testimony, 1/8/1992, p. 115, lines 6–15.

113. Aragon testimony, 1/7/1992, p. 204, line 24—p. 205, line 20.

114. Stone testimony, 12/19/1991, p. 35, lines 7–8; p. 36, lines 10–16; p. 40, lines 4–9; p. 41, line 14—p. 42, line 8.

115. Plaintiffs' Exhibit 300 (incident report, 6/12/91); Stone testimony, 12/19/1991, p. 35, lines 1–10.

116. Plaintiffs' Exhibit 300 (incident report, 6/12/91).

117. Stone testimony, 12/19/1991, p. 35, lines 9–17.

118. Stone testimony, 12/19/1991, p. 39, line 25—p. 40, line 20.

dents to the attention of staff.[119]

Inmate Stone has had urine and feces thrown into his cell [120] and has reported these incidents to staff.[121]

Inmate Stone also alleges that he has been unable to participate in educational programs. He testified that he functions at approximately a third-grade level.[122] Although he requested and ADOC provided GED preparatory educational tapes, the material was too advanced for him, and he was unable to understand it.[123]

Inmate Stone requested that he receive law books in braille. In the alternative, ADOC has offered on several occasion a legal assistant to read materials to Mr. Stone. However, he has declined the help of legal assistants.[124]

### Conclusions of Law

**I. 8th Amendment Cruel and Unusual Punishment Claim**

Plaintiffs allege that defendants' failure to provide proper accommodations for handicapped inmates violates their eighth amendment rights to be free from cruel and unusual punishment.

█ To determine whether prison conditions violate the eighth amendment, the court must examine the challenged condition of confinement and determine whether that condition "is compatible with the evolving standards of decency that mark the progress of a maturing society." *Wright v. Rushen,* 642 F.2d 1129, 1133 (9th Cir.1981). Although each condition of confinement does not exist in isolation and the court may consider the effect of the condition in the context of the prison environment, the court may not use the totality of all conditions to justify intervention more extensive than required to correct the eighth amendment violation. *Wright,* 642 F.2d at 1133. Prison officials may not deprive prisoners of basic necessities of life including adequate food, clothing, shelter, sanitation, medical care and personal safety. *Hoptowit v. Ray,* 682 F.2d 1237, 1258 (9th Cir.1982). The eighth amendment is violated if a prisoner is deprived of any of these necessities in isolation, segregation or protective custody. *Hoptowit,* 682 F.2d at 1258. Disabled inmates must be provided with physical accommodations necessary because of their disabilities, including adequate toilet and shower facilities. *LaFaut v. Smith,* 834 F.2d 389, 392–94 (4th Cir.1987); *Ruiz v. Estelle,* 503 F.Supp. 1265, 1345 (S.D.Tex.1980), *rev'd in part and aff'd in part,* 679 F.2d 1115 (5th Cir.1982), *opinion amended,* 688 F.2d 266 (5th Cir.1982). Further, mobility impaired inmates must be provided with wheelchairs and other mobility aids. *Johnson v. Hardin County, Kentucky,* 908 F.2d 1280, 1284 (6th Cir.1990). Disabled inmates are also entitled to rehabilitative therapy. *LaFaut,* 834 F.2d at 392–94.

█ The duration of confinement in the alleged condition is relevant in determining whether a constitutional violation exists. *Hutto v. Finney,* 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978); *Hoptowit,* 682 F.2d at 1258. "The longer the prisoner is without such benefits, the closer it becomes to being an unwarranted infliction of pain." *Hoptowit,* 682 F.2d at 1258.

█ Eighth amendment claims based on official conduct relevant to conditions of confinement require deliberate indifference on the part of the prison officials. *Wilson v. Seiter,* —— U.S. ——, ———–——, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991).

**119.** Stone testimony, 12/19/1991, p. 39, line 25—p. 40, line 20.

**120.** Stone testimony, 12/19/1991, p. 15, lines 23–25; Plaintiffs' Exhibit 300, incident report 6/2/91 (prisoner threatens Stone to prove he is not blind); Defendants' Exhibit 616, p. 017244 (nurse notes "strong odor of urine" in Mr. Stones cell).

**121.** Defendants' Exhibit 616, p. 017248, notes 1/3/90, 1/490; Defendants' Exhibit 923.

**122.** Stone testimony, 12/19/1990, p. 17, lines 6–7. The court notes that Mr. Stone's testimony is relatively articulate for such a limited level.

**123.** Stone testimony, 12/19/1991, p. 17, lines 8–20.

**124.** Upchurch testimony, 1/8/1992, p. 115, line 20—p. 116, line 2.

"The cost or inconvenience of providing adequate facilities is not a defense to the imposition of a cruel punishment." *Spain v. Procunier*, 600 F.2d 189 at 200 (1979).

### A. Mobility Impaired Inmates

■ In this case, at the time of the filing of this action, many of the ADOC facilities lacked accessible bathrooms, showers and cells. On March 16, 1990, defendants housed 68 inmates throughout the system who were confined to wheelchairs, had artificial limbs or who were partially paralyzed. As a result of the lack of accessible bathrooms, showers and cells, inmates, including inmates Murphy, Curly and Stone, either fell in the showers or were unable to use those facilities. On one occasion, inmate Murphy was unable to obtain medical care. Because these inmates were not provided with the necessary facilities, including accessible bathrooms, showers and cells, for their disabilities, defendants violated their constitutional rights. *See, La-Faut*, 834 F.2d at 392–94; *Ruiz*, 503 F.Supp. at 1345.

■ After the filing of this action, defendants conducted a study, established a plan and implemented a portion of the plan to provide physical facilities that are accessible to physically handicapped inmates. Although defendants do not plan to make every facility totally accessible, defendants plan to make one unit of each custody level accessible to the handicapped and concentrate the handicapped inmates in those units. If defendants implement these proposed renovations, disabled inmates will be provided with proper accommodations and the eighth amendment violations will be eliminated.

■ As a general rule, voluntary cessation of allegedly illegal conduct does not make a case moot. *Lindquist v. Idaho State Board of Corrections*, 776 F.2d 851, 854 (9th Cir.1985). The case is only moot if "it can be said with assurance that there is no reasonable expectation ... that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Lindquist*, 776 F.2d at 854; *Gluth v. Kangas*, 951 F.2d 1504, 1507 (9th Cir.1991). Defendants had completed some of the changes, making some of the units handicapped accessible at the time of trial. However, many of the renovations had been delayed for funding reasons and were not completed at the time of trial. Thus, the proposed renovations have not "completely and irrevocable eradicated the effects of the alleged violation." Thus, the Court has the authority and deems it proper to monitor the remaining renovations for the short period of time necessary to complete the physical changes to the facilities. *Id.* This monitoring can be done within the confines of the monitoring of the mental and dental health care systems.

■ Although plaintiffs also presented instances in which inmates did not receive special equipment, plaintiffs did not establish that each of those examples rise to the levels of constitutional violations. Relevant to inmate Murphy, defendants did provide repairs for his wheelchair. On the date that inmate Harris fell from his bunk, defendants moved him to the bottom bunk. Further, defendants have procedures to prevent such occurrences, including identification cards carried by epileptic inmates and a requirement that such inmates be given bottom bunks. Finally, the inmate at San Pedro received his leg prothesis unit from an outside provider within seven weeks of the initial request. In the interim, defendants provided crutches. There is no evidence that the unit could or should have been obtained more quickly. To the extent that there was a delay, the defendants have implemented new policies to assure that outside referrals are completed in a timely manner. *See* Findings of Fact and Conclusions of Law for Medical, Dental and Mental Health Care, pp. 166–67.

■ In addition, even if those examples established individual violations, they are not sufficient to show a system-wide condition of confinement problem that rises to an eighth amendment cruel and unusual punishment violation.

### B. Visually and Hearing Impaired Inmates

#### 1. Hearing Impaired Inmates

■ As of March 16, 1990, defendants housed 61 hearing impaired inmates at sever-

al institutions throughout the state. Plaintiffs presented numerous examples of inmates who experienced delays in obtaining hearing aids through the medical care system. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay or intentionally interfere with medical treatment. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). However, a mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See May v. Enomoto*, 633 F.2d 164, 167 (9th Cir.1980); *Shapley v. Nevada Bd. of State Prison Com'rs*, 766 F.2d 404, 407 (9th Cir.1985). A delay in treatment does not constitute a violation of the eighth amendment unless the delay caused substantial harm. *Wood v. Housewright*, 900 F.2d at 1335. In cases in which the system's constitutionality is at issue, deliberate indifference to the serious medical needs of prisoners may also be "evidenced by repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" or by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.1983), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984).

■ In this case, plaintiffs did not establish any harm that resulted from the delays. However, plaintiffs established a consistent pattern of delays in receiving hearing aids when tests established hearing losses. These problems existed within the specialty care outside provider system and such delays violated the "reasonably speedy" requirement for outside referrals. *Hoptowit*, 682 F.2d at 1253. However, the new policy for outside referrals should resolve these delay problems. *See*, Findings of Fact and Conclusions of Law for Medical, Dental and Mental Health Care Issues, pp. 166–67.

### 2. Visually Impaired Inmates

■ As of March 1990, defendants housed 24 legally blind inmates at several institutions throughout the state. Plaintiffs presented the testimony of legally blind inmate Roman Stone to establish that ADOC violates blind inmates' constitutional rights. However, the evidence establishes that defendants have not violated inmate Stone's eighth amendment right to be free from cruel and unusual punishment. ADOC treatment of inmate Stone does not rise to the level of deliberate indifference of his needs due to his handicap. Defendants have had inmate Stone evaluated on numerous occasions and have provided the recommended services. Although defendants have not placed inmate Stone in a specific rehabilitation program, they have provided him numerous talking books, catalogs of equipment from which he can order and assistance in learning braille. Although he complains that he cannot properly clean his cell, the outside consultant found that he should be able to clean and move around in his cell. As for the foreign objects in his food, defendants have made every effort to assure that other inmates and guards cannot tamper with his food.

■ Relevant to his access to the Courts, ADOC is not required to provide braille legal books as he requested. Rather, they have offered legal assistance to inmate Stone, which he has declined. Such offers comply with this Court's findings relevant to the legal access issues in this case.

■ Even if inmate Stone's constitutional rights had been violated, one instance of a constitutional violation for a blind inmate does not establish that the defendants violate the constitutional rights of all or a majority of the blind inmates.

## II. *Section 504 of the Rehabilitation Act of 1973*

Plaintiffs allege that defendants discriminate against handicapped inmates in violation of Section 504 of the Rehabilitation Act of 1973, which provides:

No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimi-

nation under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service ...

29 U.S.C.A. § 794(a) (West Supp.1992).

The Supreme Court has found that Section 504 guarantees "meaningful access" to programs or activities receiving federal financial assistance for otherwise qualified handicapped individuals. *Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985). "To assure meaningful access, reasonable accommodations in the ... program or benefit [receiving federal financial assistance] may have to be made." *Id.*

 Section 504 of the Rehabilitation Act applies to inmates' access to prison activities, such as disciplinary proceedings and counseling. *Bonner v. Lewis*, 857 F.2d 559, 562 (9th Cir.1988). To demonstrate violations of § 504, the plaintiffs must establish that (1) they are handicapped persons under the Rehabilitation Act; (2) that they are otherwise qualified; (3) that the relevant program receives financial assistance; and (4) that the defendants' refusal to provide the services impermissibly discriminates against the plaintiffs based on their physical handicaps. *Bonner*, 857 F.2d at 562–63.

Plaintiffs must first establish that they are "handicapped persons" under the Rehabilitation Act. *Bonner*, 857 F.2d at 562–63. The Act defines "individual with handicaps" as:

any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

29 U.S.C.A. § 706(8)(B) (West Supp.1992). *See also* 28 C.F.R. § 42.540(k) (1992).

Federal regulations further define these elements. Federal regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks walking, seeing, hearing, speaking, breathing, learning and working." 28 C.F.R. § 42.540(k)(2)(ii) (1992). Federal regulations further explain that "has a record of such an impairment"

means "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 28 C.F.R. § 42.-540(k)(2)(iii) (1992). Federal regulations also further explain that "is regarded as having an impairment" means:

(A) Has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation;

(B) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(C) Has none of the impairments defined in paragraph (k)(2)(i) of this section but is treated by the recipient as having such impairment.

C.F.R. § 42.540(k)(2)(iv) (1992).

 It is undisputed that numerous members of the plaintiff class are handicapped within the meaning of the Act. In 1990, ADOC housed 68 mobility impaired inmates, 61 hearing impaired inmates and 24 blind inmates throughout the system. Of those inmates that plaintiffs presented as mobility impaired, plaintiffs established that inmates Murphy, Curly and Stone were handicapped within the meaning of the Rehabilitation Act. However, relevant to the hearing impaired inmates, plaintiffs did not establish that any of the inmates who had delays in receiving hearing aids had hearing impairments which would allow not them to participate in programming at prisons. As for blind inmates, although defendants appear to dispute inmate Stone's blindness, he is handicapped within the meaning of the Rehabilitation Act.

Second, plaintiffs must establish that they are "otherwise qualified." *Bonner*, 857 F.2d at 562–63. The Supreme Court has defined an "otherwise qualified person" as "one who is able to meet all of the program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). To be "qualified," the handicapped individual must meet "the essential eligibility requirements for the receipt of [program]

services." 28 C.F.R. § 42.540(1)(2). The Ninth Circuit has found that prison inmates within the ADOC, are generally "qualified (sometimes required) to participate in activities such as disciplinary proceedings, Honor Dorm Review committee hearings, counseling, rehabilitation, medical services and other prison activities." *Bonner v. Lewis*, 857 F.2d 559, 563 (9th Cir.1988).

█ In this case, plaintiffs established that inmate Murphy on at least one occasion was unable to participate in medical services because of his handicap. However, this problem should be resolved by the changed sick call system in Florence and the modifications that are being made to provide accommodations to inmates with mobility impairments. Relevant to the alleged hearing impaired inmates, plaintiffs failed to establish that they were qualified for receipt of program services. As for blind inmates, the only blind inmate that presented testimony was Roman Stone. Despite the fact that defendants provided him with GED tapes, inmate Stone was unable to participate in the GED program because he functions on a third grade level. Thus, he was not qualified for that program and was not denied access to the program because of his handicap.

Third, plaintiffs must establish that the relevant program receives financial assistance. *Bonner*, 857 F.2d at 562–63. It is undisputed that ADOC receives federal assistance. Further, the Ninth Circuit found in *Bonner* that the ADOC receives such assistance. *Bonner*, 857 F.2d at 562–63.

█ Finally, the plaintiffs must establish that the defendants' refusal to provide the services impermissibly discriminates against the plaintiffs based on their physical handicaps. *Bonner*, 857 F.2d at 562–63. The problem in this case is that plaintiffs did not identify particular programs from which any of the handicapped inmates were excluded because of their handicaps. Other than in-mate Murphy's testimony that he could not go to medical on one occasion, plaintiffs did not establish that any mobility impaired inmates, because of their handicaps, were denied access to programs for which ADOC receives federal funding. Similarly, plaintiffs did not establish that any of the hearing or visually impaired inmates were excluded from programs. Thus, plaintiffs failed to establish violations of Section 504 of the Rehabilitation Act of 1973.

## *ORDER*

IT IS THEREFORE ORDERED THAT:

(1) The Court has determined that written rules or policies should be implemented to remedy the constitutional violations for handicapped inmates. When the parties meet [no later than May 31, 1993] for the mental health care issues, they shall also discuss the possible written rules necessary to remedy the past constitutional violations for handicapped inmates.

(2) Defendants shall also include in their periodic status reports for the medical and dental health care systems, the first of which is due September 30, 1993, the status of the implementation of the program to make the particular units within the facilities accessible to handicapped individuals with mobility impairments. The first status report shall identify all of the changes implemented in each unit since the defendants began implementing the program and shall also indicate what other specific changes at specific locations will be undertaken on specific times in the future.