Fletcher **CASEY, Jr., et al., on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,**

v.

**Samuel A. LEWIS, Director, Arizona Department of Corrections, et al., Defendants–Appellants.**

**No. 93–17169.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 16, 1994.

Submission Deferred Nov. 17, 1994.

Resubmitted Nov. 23, 1994.

Decided Dec. 27, 1994.

Daniel P. Struck, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants-appellants.

Elizabeth Alexander, ACLU Nat. Prison Project, Washington, DC, for plaintiffs-appellees.

Before: LAY,* PREGERSON, and O'SCANNLAIN, Circuit Judges.

PREGERSON, Circuit Judge:

Defendants–Appellants Samuel A. Lewis, Director of the Arizona Department of Corrections, et al., appeal the district court's order finding that Plaintiffs–Appellees Fletcher Casey Jr., et al., prisoners incarcerated in facilities of the Arizona Department of Corrections, were unconstitutionally denied meaningful access to the courts. Defendants also appeal the district court's issuance of a permanent injunction requiring the Arizona Department of Corrections to implement a plan to ensure prisoners meaningful access to the courts. We have jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). We AFFIRM in part, and VACATE and REMAND in part.[1]

## BACKGROUND

The Arizona Department of Corrections ("ADOC") operates nine prison facilities located within the State of Arizona. The total male inmate population as of January 22, 1992 was 14,424 and the total female inmate population was 922. On January 12, 1990, pursuant to 42 U.S.C. § 1983, twenty-two prisoners filed this class action in the United States District Court for the District of Arizona, claiming, *inter alia*,[2] that prison officials unconstitutionally denied them meaningful access to the courts. The certified class consists of all adult persons who are now, or who will be, in the custody of the Arizona Department of Corrections. Defendants are agents, officials, or employees of ADOC.

On November 16, 1992, following a three-month bench trial, U.S. District Judge C.A. Muecke ruled that ADOC's law libraries and legal assistance programs were inadequate, unconstitutionally denying prisoners meaningful access to the courts. *Casey v. Lewis*, 834 F.Supp. 1553 (D.Ariz.1992). Specifically, Judge Muecke found the following constitutionally deficient: the contents of the library; the access to the libraries; the legal assistance for prisoners who are illiterate or who do not speak English; library staffing; the indigency standard for receiving legal supplies; the photocopying policy that allowed the confidentiality of legal documents to be breached; and the restrictions on inmates' telephone calls to their attorneys. *Id.*

The district court appointed Dan Pachoda as Special Master and Expert, and Janet Bliss as Assistant Special Master to work with the parties to develop the proper injunctive relief. On October 13, 1993, the district court issued a permanent injunction, requir-

---

* The Honorable Donald P. Lay, Senior Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

1. At oral argument, attorneys for both Plaintiffs and Defendants expressed a willingness to use the services of this Court's settlement program. This settlement program provides an opportunity for litigants to resolve their dispute in a non-adversarial setting. Ninth Circuit Rule 33–1. Accordingly, we deferred submission of this case for thirty days to enable the parties to reach a settlement. However, before the settlement process had even begun, Defendants declined to mediate. Accordingly, we took this case out of deferred submission into active status.

2. The complaint also alleged that prison officials unconstitutionally denied plaintiffs attorney-client contact visitation at high-risk prison facilities, prevented HIV-positive inmates from applying for food-service positions in prison cafeterias, and transferred inmates from prison sites within the State without procedural due process. The district court granted summary judgment in favor of the plaintiff class, and entered an order enjoining ADOC from prohibiting contact visits between inmates and their attorneys except for good cause, and enjoining ADOC from denying food-service employment to HIV-positive inmates absent certain justifications. *Casey v. Lewis*, 773 F.Supp. 1365 (D.Ariz.1991). A divided panel of this Circuit reversed the district court's grant of summary judgment and vacated the injunction. *Casey v. Lewis*, 4 F.3d 1516 (9th Cir.1993).

On the remaining allegations, which are not the subject of this appeal, the district court ruled that the treatment available to seriously mentally ill inmates violated the Eighth Amendment, the unequal treatment of male and female inmates violated the female inmates' equal protection rights and Eighth Amendment rights, instances in which ADOC failed to provide disabled inmates accessible bathrooms, showers, and cells did not rise to the level of constitutional violations, delays in providing hearing aids violated the Eighth Amendment, and the provision of legal assistance instead of braille legal books did not violate blind inmates' rights. *Casey v. Lewis*, 834 F.Supp. 1477 (D.Ariz.1993); *Casey v. Lewis*, 834 F.Supp. 1569 (D.Ariz.1993).

ing ADOC to implement the legal access plan devised by Pachoda. ADOC now appeals, challenging the district court's findings of fact and conclusions of law, the scope of injunctive relief ordered, and the requirement that ADOC pay the fees of the Special Master without having been given an opportunity to object.

## ANALYSIS

### A. Standard of Review

We review the district court's legal conclusions de novo. *U.S. v. Yacoubian,* 24 F.3d 1, 3 (9th Cir.1994). We defer to the district court's findings of fact unless they are clearly erroneous. *Anderson v. City of Bessemer,* 470 U.S. 564, 571–73, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985); Fed. R.Civ.P. 52(a). We review the scope of injunctive relief for an abuse of discretion or application of erroneous legal principles. *Dexter v. Kirschner,* 984 F.2d 979, 982 (9th Cir.1992).

### B. District Court's Findings of Fact and Conclusions of Law

In *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977), the Supreme Court firmly established that prisoners have a fundamental right of meaningful access to the courts. The importance of this right cannot be overstated. It is the right upon which all other rights depend. In *Wolff v. McDonnell,* 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974), the Court explained that this right "is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *See also Gilmore v. Lynch,* 319 F.Supp. 105, 110 (N.D.Cal.1970) (" 'Access to the courts' ... encompasses all the means a defendant ... might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him."), *aff'd sub nom. Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (per curiam).

To discharge the duty of assuring prisoners meaningful access to the courts, the Court held that States "must assist inmates in the preparation and filing of meaningful papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds* 430 U.S. at 828, 97 S.Ct. at 1498. In determining the constitutional adequacy of a legal access program, the Court directed district courts to evaluate the program "as a whole," emphasizing that "meaningful access to the courts is the touchstone." *Id.* at 832, 823, 97 S.Ct. at 1500, 1495.

We hold that the district court correctly applied case law in concluding that ADOC's legal access program unconstitutionally denied inmates meaningful access to the courts. In *Storseth v. Spellman,* 654 F.2d 1349, 1352 (9th Cir.1981), we held that it is the State's burden to provide meaningful access and to demonstrate that its chosen method is adequate. ADOC has not met this burden.

#### 1. Contents of the Law Libraries

Undisputed facts support the district court's finding that the contents of ADOC's law libraries are inadequate. In several libraries, volumes of various reporters, as well as the pocket parts to various secondary sources are missing. Updated inventories are unquestionably an essential element of an adequate library system. *See Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851 (9th Cir.1985) (affirming district court's order that state must furnish essential and up-to-date law books).

Several libraries also do not contain self-help manuals to instruct inmates on how to use the law books. The complexities of legal research at the very least require these aids to enable inmates to use the books effectively. As the Court in *Bounds* mandated, access must be "adequate, *effective,* and meaningful." 430 U.S. at 822, 97 S.Ct. at 1495 (emphasis added).

#### 2. Physical Access

We recognized in *Lindquist* that the Constitution does not guarantee a prisoner unlimited access to a law library, and that "[p]rison officials of necessity must regulate the time, manner, and place in which library

facilities are used." 776 F.2d at 858. Accordingly, in *Toussaint v. McCarthy*, 801 F.2d 1080, 1109 (9th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987), we held that prisons may deny inmates physical access to the law library if such access would threaten institutional security. We affirmed the district court's order that required prison officials to allow segregated prisoners access to a law library "as reasonably necessary, absent documented security reasons." *Id.* at 1108–09.

 Following the rule established in *Toussaint*, we hold that unless ADOC can demonstrate actual security risks, an inmate should be allowed access to the law library. The district court correctly concluded that ADOC may not routinely prohibit lockdown inmates from physically using the law library.[3] Access to the law library's books is crucial because as we explained in *Toussaint*,

> legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case.

801 F.2d at 1110 (quoting *Williams v. Leeke*, 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979)).

### 3. Legal Assistance

 For those inmates deemed security risks and denied access to the library, *Bounds* requires the State to provide legal assistance. 430 U.S. at 828, 97 S.Ct. at 1498. The district court did not err in concluding that the legal assistance provided by ADOC was constitutionally deficient. In some facilities, officials do not require inmate applicants to possess any qualifications aside from a literacy in English. In others, the tests developed to assess the applicants' qualifica-

tions do not test for skills in legal research and writing, nor do the officials administer the tests to all of the applicants. Furthermore, in most facilities, the officials do not provide any type of training for the legal assistants. This deficiency directly contravenes the rule set forth in *Bounds* that legal assistance must be provided by persons "trained in the law." *Id.* See also *Gluth v. Kangas*, 951 F.2d 1504, 1508 (9th Cir.1991) ("the appearance of minimal capacity to assist other inmates alone plainly does not suffice").

 Sufficient numbers of trained legal assistants also must be provided to prisoners who are functionally illiterate or whose primary language is not English. It goes without saying that "a book and a library are of no use, in and of themselves, to a prisoner who cannot read." *Lindquist*, 776 F.2d at 855–56. ADOC's failure to provide bilingual legal assistants or law clerks in many of the facilities denies non-English-speaking inmates meaningful access. The reliance upon fellow prisoners who are not trained in the law simply does not suffice as an adequate substitute. As the district court found, these fellow prisoners frequently cannot comprehend nor translate legal terminology. Consequently, illiterate and non-English-speaking inmates have been unable to file legal actions or have had their cases dismissed with prejudice.

To be sure, we have held that "the Constitution does not require the elimination of all economic, intellectual, and technological barriers to litigation." *Sands v. Lewis*, 886 F.2d 1166, 1169 (9th Cir.1989). However, in invalidating regulations that barred prisoners from assisting each other, the Supreme Court recognized that for illiterate inmates, an adequate library alone was plainly insufficient. *Johnson v. Avery*, 393 U.S. 483, 489, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (1969); *Wolff v. McDonnell*, 418 U.S. at 577–80, 94 S.Ct. at 2985–87.[4] The duty of States to

---

**3.** We acknowledge that in *Vandelft v. Moses*, 31 F.3d 794, 797 (9th Cir.1994), a divided panel of our Court held that a prisoner who contends that his right of access to the courts was violated because of inadequate access to a law library "must show that the inadequate access caused him actual injury." However, because this issue

is not now before us, we need not consider *Vandelft*.

**4.** Indeed, as the *Bounds* Court pointed out, the Court in *McDonnell* decided that inmates should be allowed to assist each other despite the fact

furnish legal assistance to illiterate inmates and non-English-speaking inmates is implicit in the holding of *Bounds*, which imposed on States *"affirmative* obligations to assure *all* prisoners meaningful access to the courts." 430 U.S. at 824, 97 S.Ct. at 1496 (emphasis added). Without such assistance, illiterate and non-English-speaking inmates undoubtedly would be unable to draft any legal papers, much less meaningful ones.[5] As the Sixth Circuit observed, "there can be no meaningful access to the judicial system unless some literate person is available to reduce ... [the] stories [of illiterate inmates] to intelligible written pleadings." *Knop v. Johnson*, 977 F.2d 996, 1006 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993). Importantly, the *Bounds* Court noted the advantages of providing legal assistance over libraries alone: more efficient and skillful handling of prisoner cases, the avoidance of disciplinary problems associated with writ writers, and the mediation of many prisoner complaints that would otherwise burden the courts.[6] 430 U.S. at 831–32, 97 S.Ct. at 1499–1500.

ADOC argues that it does not need to provide legal assistance to illiterate and non-English-speaking prisoners because through the provision of a law library, it has removed "the barriers to court access erected by imprisonment." Appellants' Brief at 23. This argument is without merit because ADOC overlooks the fact that the restrictions on a prisoner's liberty attendant to imprisonment prevents the prisoner from enlisting the assistance of his family, friends, and a myriad of social services and legal aid organizations that would otherwise be available.

#### 4. Library Staff

█ In *Lindquist*, 776 F.2d at 855, we noted that to furnish an adequate law library, "some library personnel might be required to keep the books in order." In some facilities, ADOC staffs the library only with security officers who are not trained in maintaining a law library. We affirm the district court's conclusion that this is inadequate. Library staff should at least have some basic knowledge of legal research.

#### 5. Indigency Standard

*Bounds* affirmed the principle that "indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." 430 U.S. at 824–25, 97 S.Ct. at 1496. ADOC's indigency policy allows a prisoner to obtain free legal supplies only if his account balance does not exceed $22 per month. The prisoner's account is then debited the cost of the supplies, and the debit is held against the account until funds become available.

Defendants argue that the prisoners here have failed to allege an actual injury in a non-core *Bounds* issue, as required under *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir.1989). In *Sands*, we held that if the claimant does not allege inadequate law libraries or inadequate legal assistance, a court must consider whether the allegation consists of a "specific instance in which an inmate was actually denied access to the courts." *Id.*

█ Although Plaintiff's Complaint did not allege that ADOC's indigency standard denied inmates meaningful access to the courts, Plaintiffs did introduce, without any objection from Defendants, evidence to show that the indigency standard was inadequate. *See* Transcript at 136 ·(McFadden—Direct) (testimony that the cost of basic supplies alone can amount to $20); Transcript at 154 (Bishop—Direct) (testimony that prisoners were unable to purchase needed legal · supplies under the $22 standard). In addition, the adequacy of the indigency standard was addressed in Defendants' pre-trial memoran-

---

that the State already furnished an adequate law library. 430 U.S. at 824, 97 S.Ct. at 1496.

**5.** This holding is in harmony with the requirement under *Bounds* that indigent inmates must be provided legal supplies necessary to file their claims. 430 U.S. at 824, 97 S.Ct. at 1496.

**6.** In the Ninth Circuit alone, fourteen staff attorneys in San Francisco divide their time exclusively between direct criminal appeals and habeas corpus petitions. Thirteen attorneys work on civil appeals, at least 50 percent of which are prisoner § 1983 actions. There are twenty *pro se* law clerks and nine law clerks who focus exclusively on death penalty appeals.

dum. *See* Defendants' Amended Pre–Trial Statement at 15.

**[16, 17]** Under Fed.R.Civ.P. 15(b), "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Express consent may be found in a stipulation or pre-trial order, and implied consent may be found where evidence is introduced without objection. *See Dunn v. Trans World Airlines, Inc.*, 589 F.2d 408, 413 (9th Cir.1978) (Rule 15(b) amendment proper since opposing party referred to unpleaded matter in its trial memorandum); *Slavitt v. Kauhi*, 384 F.2d 530, 534 (9th Cir.1967) (district court should grant leave to amend because issue was introduced into evidence without objection from defendant); 3 *Moore's Federal Practice* ¶ 15.11 (1994).

Instead of permitting Plaintiffs to amend their pleadings to include an allegation that ADOC's indigency standard deprived indigent inmates meaningful access to the courts, we will treat the pleadings as having been so amended because under Rule 15(b), "the failure to . . . amend does not affect the result of the trial." *See also Dunn*, 589 F.2d at 413 ("If an amendment to the pleadings to conform to the proof should have been made, the Courts of Appeals will presume that it is so made to support the judgment.") (citations omitted).

A study of the actual cost of basic supplies and legal supplies at the Florence unit determined that $46 is the more realistic amount. *Gluth*, 951 F.2d at 1508. However, because the district court did not make a specific finding that ADOC's indigency standard was inadequate for this plaintiff class, we remand this issue for a proper finding.

### 6. Photocopying Policy

We reject Defendants' erroneous assertion that Plaintiffs have not alleged an "actual injury" as defined by *Sands, supra*, to state a claim that the photocopying policy breaches the confidentiality of inmates' legal documents. Plaintiffs' Complaint specifically alleges that their confidential legal memos from legal assistants are routinely read by ADOC staff and that because they must give their materials to the staff to be photocopied, the confidentiality of those materials is compromised. Complaint at 14. Read liberally, as required by our decisions, these allegations suffice to state a claim for the denial of meaningful access to the courts. *See King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir.1987) (plaintiffs successfully alleged that the provision of only three stamps per week denied them meaningful access to the courts even though complaint only stated that it was often necessary to communicate with the courts more than three times per week).

The district court found that inmates' legal documents have been read by staff members who photocopy them. In *Wolff v. McDonnell*, 418 U.S. at 575–77, 94 S.Ct. at 2984–85, the Court upheld a prison regulation that allowed staff to inspect, but not to read, inmates' legal mail. Lower courts have held that legal mail may not be read nor copied without the permission of the inmate. *Jensen v. Klecker*, 648 F.2d 1179, 1182 (8th Cir.1981); *Ramos v. Lamm*, 639 F.2d 559, 582 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Guajardo v. Estelle*, 580 F.2d 748, 758–59 (5th Cir.1978). Thus, the district court did not err in concluding that ADOC's photocopying policy, which allows the confidentiality of inmates' legal documents to be breached, denies inmates meaningful access to the courts.

### 7. Telephone Calls to Attorneys

In *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir.1990), we held that "policies will not be upheld if they unnecessarily abridge the defendant's meaningful access to his attorney and the courts," and that "the opportunity to communicate privately with an attorney is an important part of that meaningful access." *See also Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974) ("Regulations and practices that unjustifiably obstruct the availability of professional representation . . . are invalid."). Because an inmate's access to his attorney is inextricably tied to his meaningful access to

the courts,[7] we reject Defendant's argument that to state a claim, Plaintiffs need to allege an actual instance in which their access to the courts has been impeded.

■ The district court correctly concluded that the restrictions on attorney telephone calls interfere with inmates' meaningful access to the courts. ADOC has not advanced any legitimate justification for its restrictions, such as the limitation of calls to issues related to a prisoner's sentence, the granting of calls according to institutional risk score as opposed to need, and the requirement that a prisoner divulge the nature of a call before it is granted.

### C. Scope of Injunctive Relief

Defendants challenge the breadth of the district court's permanent injunction,[8] arguing that it extends beyond the scope authorized by *Bounds*. It is well established that "once a right and a violation have been shown, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Hutto v. Finney*, 437 U.S. 678, 688 n. 9, 98 S.Ct. 2565, 2572 n. 9, 57 L.Ed.2d 522 (1979) (citations omitted). While the remedy must do no more and no less than correct a particular constitutional violation, *Hoptowit v. Ray*, 682 F.2d 1237, 1246–47 (9th Cir.1982), "a federal court may order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy ... [that] violation." *Toussaint*, 801 F.2d at 1087. *See also Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (Milliken II) (1977) (upholding remedial educational programs to cure effects of *de jure* segregation even though such programs are not required under the Constitution).

We conclude that the district court did not abuse its discretion in ordering the relief set forth in its permanent injunction. At the outset, we must address what can only be characterized as the tension between the twin holdings of *Bounds*. *See* Michael B. Mushlin, 2 *Rights of Prisoners* 35–41 (2d ed. 1993). On the one hand, the mandate to States is to assure "meaningful access." 430 U.S. at 823, 97 S.Ct. at 1495. But to discharge this duty, the Court prescribed "adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498. Some circuits, including our own, have interpreted *Bounds* only to require *either* adequate law libraries or adequate legal assistance. *See Lindquist*, 776 F.2d at 855. Practically, though, because the great mass of prisoners are not sufficiently educated, such a legal access plan would still keep out of their reach meaningful access to the courts. Accordingly, in *Lindquist*, we went on to say that even though states may choose which of the two components to provide, "this is not to say that a court may never order a mixture of [the two]." *Id.* (quoting *Cepulonis v. Fair*, 732 F.2d 1, 6 (1st Cir.1984)).

■ Defendants appropriately remind us that a remedy may not overly intrude into the administration of the prison system. *Toussaint*, 801 F.2d at 1087. Yet, the remedy ultimately must be "effective." *Id.* at 1086. Given that 35 percent of ADOC's inmate population cannot read English above the seventh grade level, and 14.5 percent cannot speak English, it is unrealistic to expect that meaningful access to the courts can be achieved by providing law libraries alone. The adequacy of any remedial program must turn on its effectiveness in satisfying the State's obligation to ensure meaningful access to the courts. In fashioning an effective remedy, it is within the discretion of the district court to order a combination of remedial programs.

#### 1. Contents of Libraries

■ The order requiring the purchase of the Pacific Reporters and Digests is reason-

---

7. When an attorney is involved, the likelihood of a prisoner obtaining discovery, a hearing, and ultimate relief increases significantly. *See* Turner, *When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts*, 92 Harv. L.Rev. 610, 624–25 (1979).

8. The permanent injunction is attached as Appendix A to this opinion.

able. As the district court noted, because some prisoners detained in ADOC facilities are serving time for crimes committed in a neighboring state, they will need the case law of that state, which is contained in the Pacific Reporters but not in the Arizona Reporters. In addition, in shepardizing Arizona cases, the researcher is often referred to other cases decided in the western region of the United States, warranting the inclusion of the Pacific Reporters in the libraries' inventory.

## 2. Physical Access

■ The injunction orders ADOC to allow all inmates access to the law libraries absent a showing that the inmate is a security risk. Defendants argue that under this order, an inmate must first cause harm before being denied access, thus precluding officials from taking preventive measures to maintain security. We disagree. The order seeks to prevent the arbitrary denial of access to the library, thus prison officials would be in compliance with the order if they can rationally justify a particular denial.

■ The order requiring the law libraries to remain open for at least fifty hours each week is reasonable. Although ADOC subsequently expanded the hours of operation, the district court found that at the time this action was filed, prisoners had insufficient time to use the libraries. *See Lindquist,* 776 F.2d at 858 ("the existence of an adequate law library does not provide for meaningful access to the courts if the inmates are not allowed a reasonable amount of time to use the library"). Given the finding of the district court, and that there is no "reasonable expectation" that the violations will not recur, *see Gluth,* 951 F.2d at 1507, the district court did not abuse its discretion in ordering expanded hours to prevent Defendants from reverting to their prior practice. Fifty hours per week does not constitute "unlimited access." *See Lindquist,* 776 F.2d at 858. Indeed, this relief, which amounts to approximately seven hours per day, is less than the eleven hours per day ordered in *Lindquist. Id.*

## 3. Legal Assistance

■ Defendants erroneously assert that the injunction mandates legal assistance for all prisoners. Consistent with *Bounds,* the injunction explicitly states that legal assistance should be provided to prisoners who "because of language factors or lack of access to the law library, or for other reasons, are unable to perform adequate legal research and writing." Permanent Injunction at 11.

The training videotape for all the prisoners, to which Defendants object, does not constitute "legal assistance." Rather, it is a form of self-help that the district court, in its discretion, concluded would make the law library accessible to the prisoners. Defendants also have not shown any hardship that would result from making the videotape available to all the prisoners. ADOC has already ordered the tape to train the law clerks and legal assistants.

## 4. Library Staff

■ Contrary to Defendants' assertion, the injunction does not require each librarian to possess a law degree or paralegal degree. Rather, the injunction requires "professionally trained" librarians who must possess either a library science degree, law degree, or paralegal degree. Permanent Injunction at 7–8. While we express no opinion on whether the librarian should be trained in the law, at the very least, it is not unreasonable to ensure that the librarian is in fact trained for the demands of his or her job through the requirement of a library science degree and a basic knowledge of legal research.

## 5. Indigency Standard

The district court ordered ADOC to set the indigency standard at $46. However, as discussed above, because the district court did not make a specific finding as to the inadequacy of ADOC's current standard, we vacate this provision of the injunction and remand for a proper finding.

Because Plaintiffs do not challenge Defendants' objection to the order requiring ADOC to provide typewriters, we vacate that provision of the injunction (Section III.C.).

### 6. Photocopy Policy

Similarly, because Plaintiffs do not object to an increase of photocopying costs from five cents per page to eight cents per page, we remand this issue to the district court to determine whether the increase is justified.

■ We affirm the requirement that ADOC post a sign by the photocopy machine directing staff not to read inmates' legal materials. Not only does this relief fall entirely within the discretion of the district court, but Defendants also concede that it is "innocuous." Appellants' Reply Brief at 15.

### 7. Attorney Telephone Calls

■ We affirm the requirement that prisoners be allowed at least three twenty-minute phone calls per week to their attorneys. The order certainly does not ignore, as Defendants contend, ADOC's preference that such communications occur through written correspondence or in-person interviews. It is undisputed that ADOC can implement this provision at little cost since the prisoner either calls collect or pays for the calls. Furthermore, this provision can potentially save staff time because it would no longer be necessary for the staff to determine which phone calls qualify as an emergency.

### D. Defendants' Failure to Preserve their Objections

■ Plaintiffs contend that with respect to the functions of the legal assistants, ADOC never contested the relevant provision in the proposed order, thereby waiving its right to object after the final order was entered. However, Plaintiffs' citation of *Gluth* is inapposite because we held there that the defendants should have raised an argument on an issue when the district court entered its partial final judgment, which effectively closed that issue. 951 F.2d at 1511. Because the proposed order here does not constitute a final judgment, we reject Plaintiffs' argument that Defendants failed to preserve their objections. Moreover, in *Gluth*, despite the defendants' failure, we saw no reason to bar them from raising the issue on appeal. *Id.*

### E. Payment of the Special Master's Fees

■ Defendants request that it be given an opportunity to object to the *fees*, as well as the costs and expenses of the Special Master. Plaintiffs do not oppose this request. In any event, it would be unfair to order Defendants to pay the fees without an opportunity to object. Accordingly, we remand the order of reference to the district court to incorporate Defendants' request for an opportunity to object to the fees of the Special Master.

### CONCLUSION

For the foregoing reasons, we AFFIRM in part, and VACATE and REMAND in part.

### APPENDIX A

### DISTRICT COURT'S ORDER

The Arizona Department of Corrections (ADOC) shall provide meaningful access to the Courts for all present and future prisoners. The practices and procedures set out below will achieve this constitutional mandate. They concern those areas raised by or necessarily implicated in this litigation and incorporate approaches utilized by ADOC administrators.

### I. THE LAW LIBRARIES

With the exception of the existing Aspen DWI and Flamenco Units at ASPC—Phoenix, the Papago DWI and Maricopa Units at ASPC—Douglas, and the Picacho Unit at ASPC—Florence, each ADOC facility with a population or capacity of 150 or more shall contain a fully equipped law library. Each library shall have sufficient seating capacity and be open for sufficient periods to enable adequate research and compliance with this Order.

### A. ACCESS

ADOC prisoners in all housing areas and custody levels shall be provided regular and comparable visits to the law library. This opportunity may be postponed on an individual basis because of the prisoner's documented inability to use the law library without

creating a threat to safety or security, or a physical condition if determined by medical personnel to prevent library use. Upon request, a prisoner will be permitted a minimum of ten hours of actual law library use each week; additional time shall be allowed if necessary to meet a filing or other legal deadline.

Law library access shall not be reduced or discouraged by unnecessarily onerous conditions or retaliatory practices. Prisoner access to the law library shall be on terms equivalent to those for participation in other congregate activities at the facility such as classes, jobs and meals, and shall not occasion unique hardships including, but not limited to, regular strip searches of library users and automatic disciplinary write-ups for missed library visits.

### B. SCHEDULE

#### 1. Library Hours

a. Facilities that do not require advance requests for a library turn-out:

The law library shall be open for prisoner use at least 50 hours each week. This schedule shall involve hours between 7:00 a.m. and 10:00 p.m., and include at least four hours each week night between 5:00 p.m. and 10:00 p.m., and at least five hours between 7:00 a.m. and 10:00 p.m. on Saturday and on Sunday.

b. Facilities that require advance requests for a library turn-out:

The law library shall be open for prisoner use at least 60 hours each week if the facility population and capacity are less than 400, for at least 70 hours each week if either is between 400 and 700 and neither over 700, and at least 80 hours per week if either is over 700. These schedules shall involve hours between 7:00 a.m. and 10:00 p.m., and include at least four hours each week night between 5:00 p.m. and 10:00 p.m., and at least eight hours between 7:00 a.m. and 10:00 p.m. on Saturday and on Sunday.

#### 2. Prisoner Use

In all facilities, each visit or turnout must provide the prisoner a minimum of two hours of actual library use. Facilities that do not require advance requests shall provide sufficient library periods that are free of conflicts for all prisoners to have this opportunity; these facilities do not have to change the scheduled closing time for late arrivals. Every prisoner will sign the log book at the law library to indicate the time of arrival at and departure from the library; copies of the log book pages shall be maintained for the Special Master.

If more than one reading room is utilized, a prisoner may choose which room to sit in, provided that the rooms are not reserved for different custody levels and no other documented security considerations exist. This choice is subject to the need to maintain comparable numbers in each room, although a prisoner shall be allowed to sit with any prisoner providing legal help even if not a "Legal Assistant".

#### 3. Notice

At least one week prior to the end of each month ADOC shall make known to all prisoners (a) the law library schedule of hours and turnouts for the next month, and (b) the specific schedule of important activities at the facility for the next month, including visiting hours, classes, religious services, and field turnouts for each housing area; this is not required for those items whose schedule (days and hours) remains the same in the upcoming month.

Within two months of entry of this Order, for each facility ADOC shall provide the Special Master (a) the weekly law library schedule and, if applicable, the specific turnouts or sessions for different custody levels or housing areas, (b) the names of the security and civilian employees assigned to the law library with their specific hours, (c) the names of the prisoner law clerks with their specific hours, (d) the names of the prisoner Legal Assistants, and (e) the schedule of ongoing activities that might conflict with law library access, including work assignments, classes, recreation, religious services, commissary, visiting and meals.

### C. *ADVANCE REQUEST PROCEDURE*

When advance requests are used, prisoners shall be responsible for selecting their law library turnouts and for depositing their requests directly in the appropriate receptacle; this requires that ADOC provide timely and adequate information, forms, and access to receptacles.

The first library turnout requested by a prisoner must be at least three days after the day the form is deposited; this shall be less if necessary to meet a legal deadline. The week referred to in I(A) begins the day of the first scheduled turnout, and at least ten hours of library use shall be permitted during this seven-day period.

Defendants shall provide adequate notification to prisoners of the above procedures and timetables, including posting in each cell block. The Special Master, in consultation with plaintiffs and defendants, shall analyze the library and turnout schedules, including those periods regularly revealing below average attendance, and ascertain whether any alterations are required for adequate access.

#### 1. *Forms*

ADOC shall develop law library turnout and legal assistance request forms and have them regularly available in the housing areas and law library for distribution to prisoners. The law library form should minimally include space for the date submitted and for the selection of specific library turnouts and alternates for up to two weeks, and to detail any filing or other legal deadline. Any such deadline should be verified by relevant documentation possessed by the prisoner, or by a description of this information and explanation of why it is not available.

#### 2. *Receptacles*

ADOC shall maintain secure, tamper-resistant receptacles for law library and other legal assistance requests from prisoners. These receptacles must be easily accessible to prisoners in all housing areas and custody levels on a daily basis.

### D. *ADVANCE RESPONSE PROCEDURE*

Law Library staff or clerks shall collect the prisoner law library and other legal assistance forms from each deposit point at least once every day. ADOC must develop procedures for scheduling law library turnouts that provide adequate notice and access for all eligible prisoners with preference for those with filing or other legal deadlines, and that insure compliance with this Order. This minimally requires that law libraries requiring advance scheduling be equipped with a computer that is regularly and primarily used for this purpose.

Denial of a particular turnout may be based on a lack of available library space for that period, or on a finding that the requesting prisoner and a prisoner previously scheduled for that period cannot be together in the library without creating a serious threat to safety or security. If a denial occurs, the prisoner shall be given preference on the remaining requests or a timely opportunity to make additional requests if necessary to meeting the weekly ten-hour minimum requirement.

A prisoner shall be provided written notification of his or her scheduled law library turnouts and of any denied with the reason for the denial, and given the opportunity to make additional requests if necessary. This notice must reach the prisoner at least 24 hours before the time of the first requested turnout whether this was granted or denied. Copies of the names or total number of prisoners scheduled for each turnout, and of the number or percent of those who attended, will be kept at the law library for collection by the Special Master, as will copies of turnout denials.

### E. *LAW CLERKS*

ADOC shall provide a sufficient number of law library prisoner law clerks to permit adequate assistance for prisoners using the library and for those ineligible for such use, including Spanish-speaking prisoners in both categories. This assistance includes providing elementary information about the content and purpose of the books and materials in the library, and about researching specified

issues and locating relevant decisions, statutes, regulations and forms. In order to adequately perform this basic function, law clerks must successfully complete the legal research course, described in II(D) below, either prior to beginning work or the first time it is available. In contrast to Legal Assistants, law clerks shall provide guidance to all eligible prisoners, although such guidance is limited in scope and does not extend to the preparation of legal documents for others.

For each session or turnout, at least two law clerks per reading room shall be assigned to provide the court-ordered research assistance in the room and, if applicable, book retrieval for that room. Prisoners with research experience and ability shall be solicited and favored for the law clerk positions by the relevant institutional committees and administrators.

### F. RESEARCH GUIDE

The Special Master will oversee the preparation of an introductory guide to the use of the law library in Spanish and English, with brief explanations of the contents and use of the available resources and elementary research assistance on the most common legal issues. Plaintiffs and defendants will review the proposed introductory guide and have an opportunity to comment. After final approval by the Special Master, this guide shall be printed by defendants and made available to all requesting prisoners while attending the law library.

### G. LIBRARIAN

ADOC shall provide at least one full-time professionally trained librarian at each law library with adequate secretarial support for the librarian and law library. A law librarian may be assigned to a second facility provided that the population in that facility is less than 200. Subject to identified security needs, the librarian will be responsible for the policies and procedures in the law library and for insuring adequate prisoner access to the courts.

The librarian must possess a library science degree, law degree or paralegal degree. Preference shall be given to applicants with a law or paralegal degree, and each ADOC complex shall minimally employ at least one such librarian. The Special Master will work with ADOC on securing applicants, including contacting para-legal and law schools, and professional organizations. If good faith efforts are unsuccessful, the Court or Special Master may permit the hiring of an applicant with the required graduate library science degree.

### H. CONDUCT

If bathroom facilities are available, prisoners may be required to remain in the law library for a full turnout period; this may not be done for those attending solely for supplies or for notary or copy services. After being warned when possible, a prisoner may be restrained and removed from the library if he or she continues to create a threat to safety or security or to directly interfere with others' use of the library. Within 48 hours of removal, the prisoner must be provided written notice of the reasons and factual basis for this decision, with a copy held for the Special Master. A prisoner cannot adequately use the law library under restraint, including handcuffs and shackles. While in the library, non-intrusive actions, including reasonable conversations with prisoners or staff, writing, and sitting quietly, are permitted.

### I. "CHECK–OUT" SYSTEM

Prisoners in minimum and medium security facilities shall be permitted direct access to the stacks when using the law library. All prisoners in a particular maximum security institution (level 5 and above) may be denied direct access if ADOC documents vandalism or losses resulting from such access in that institution. Prisoners attending the law library shall be provided at their expense copies of limited portions of available legal materials, including cases, laws and forms, for use in the housing area; indigent prisoners shall be provided at defendants' expense any such copies required for submission to a court or agency.

If prisoners are denied direct access to the stacks ADOC must act to allow adequate research. At a minimum, upon a single check-out request for more than one book, a clerk or employee shall retrieve at least two books for the prisoner; this does not affect the practice permitting prisoner use of more than two books at a time while in the reading room.

### J. *NOISE LEVEL*

ADOC shall take all necessary steps, and correct any structural or acoustical problems, to reduce an unacceptably high noise level in any law library. At a minimum, totally enclosed reading rooms shall not be utilized. If necessary, chain or wire material may be installed in windows separating the reading room and stack and control areas, provided that this does not interfere with the sound-flow or sight-line. Such material should not inhibit normal conversation through the window between a prisoner in the reading room and an assisting law clerk or employee, nor make it difficult to read book titles and covers of other materials.

### K. *PAGING SYSTEM*

Individual prisoners who are not able or permitted to visit the law library must be allowed regular and timely access to necessary books and materials. This minimally requires daily exchanges between such prisoners and law library representatives of an adequate amount for research purposes of requested books and materials, or copies, including cases, statutes, annotations, regulations, forms, secondary sources, and research guides. Every prisoner shall be provided a copy of the research guide required by I(F) and request forms, and be visited by a law clerk or Legal Assistant or employee with legal research experience, within 24 hours of being restricted.

### L. *INVENTORY*

ADOC shall adequately maintain up-to-date collections in each law library of the materials and resources required by *Wilkinson v. MacDougall,* CIV 81–1397 (Jan. 5, 1984); Arizona Reporters are optional. With the approval of the Court or Special Master, defendants may use clearly equivalent publications including, but not limited to, the United States Code Service (for United States Code Annotated), Lawyers Editions (for Supreme Court Reporters), Federal Procedure Lawyers Edition (for Federal Practice and Procedure), and American Jurisprudence (for Corpus Juris).

In addition, each library shall adequately maintain (a) a full and up-to-date set of Pacific Reporters and Digests, (b) sufficient latest editions of at least three self-help or litigation manuals that assist prisoners on relevant substantive and procedural issues, (c) basic, up-to-date materials and forms in the areas of immigration practice and post-conviction remedies, and (d) a recent Arizona Bar Directory. The Special Master shall assist in identifying the specific materials, and approve these before use by ADOC.

## II. THE LEGAL ASSISTANCE PROGRAM

Meaningful access to the courts requires direct assistance for prisoners who, because of language factors or lack of access to the law library, or for other reasons, are unable to perform adequate legal research and writing. In the absence of a program providing such prisoners with lawyers or paralegals, ADOC must maintain a sufficient number of at least minimally trained prisoner Legal Assistants at each facility, and not set institutional limits on such persons.

### A. *SELECTION*

A prisoner shall become a Legal Assistant by agreeing to abide by the procedures governing Legal Assistants, and by taking the legal research course. It shall not be necessary for prisoners to take the course prior to being approved as a Legal Assistant or beginning work. Such persons must have some legal research training, experience, or ability, and, after selection, must successfully complete the full course including the live component when first available. Applicants are eligible for the full course if (a) they have a high school or GED diploma, or (b) pass a basic literacy skills test to the satisfaction of the instructor, or (c) are presently on an

institutional Legal Assistant list. Absent relevant new factors, transferred Legal Assistants shall be continued in that status.

An otherwise eligible prisoner may be denied Legal Assistant status, or removed as a Legal Assistant, because of documented prison behavior indicating that he or she would create a threat to safety or security in that position; such action may not be based solely on a particular custody level or housing area, or on irrelevant infractions. A prisoner must be provided written notification of this decision, with the reasons and specific acts involved and permitted an opportunity to appeal; the notice and response shall be provided to the Special Master.

## B. *NUMBER*

ADOC shall act to insure an adequate minimum number of Legal Assistants for each institution and custody level; there is no maximum. Particular steps must be taken to locate and train bilingual prisoners to be Legal Assistants. This minimally requires that schedules and notices relating to all institutional legal services and programs be made available in Spanish and English.

## C. *RETENTION*

A Legal Assistant must demonstrate at least minimal competence after one year, and thereafter upon the receipt of complaints about his or her legal work. This demonstration should be done by submitting sufficient recent legal writings and litigation materials to the legal research instructor for review, and/or by completing assigned exercises for evaluation. A determination by the instructor to remove a prisoner found not minimally competent from the Legal Assistant list must be made in writing with specific reasons and examples, and the relevant work products attached; this shall be provided to the Special Master. Such a prisoner should be reinstated upon compliance with the requirements of II(A) above.

## D. *RESEARCH COURSE*

ADOC shall offer a videotaped legal research course for all prisoners, with an additional live component for prisoner law clerks and Legal Assistants, and applicants.

### 1. *Video Component*

The video will be 30–40 hours long with a primary focus on the fundamentals of legal research and writing, including use of the books and materials available in the law libraries. Doctrinal areas of most concern to prisoners should be covered, including 42 U.S.C. Section 1983 and other major civil rights laws; prison practices, including disciplinary and classification measures; relevant tort and civil law, including immigration and family issues, and relevant areas of criminal procedure, including appeals, collateral attacks, Habeas Corpus and time computations.

The entire video will be available for viewing by prisoners at least once in any six month period. Particular sessions (up to six hours) shall be available for viewing at least once in any three month period for a requesting prisoner. ADOC shall develop mechanisms for the required viewing in each facility, and submit these plans to the Special Master.

The video shall be prepared by persons selected and supervised by the Special Master. It will be funded by ADOC and used in all ADOC facilities. The taped materials shall be reviewed and updated as needed, but at least once every three years.

### 2. *Live Component*

Shortly after viewing the taped course, prisoner law clerks and Legal Assistants, and applicants, shall be offered an additional twenty hours of live instruction. This opportunity shall be available at least once in a six month period. The instructors shall be lawyers, law students or trained paralegals with demonstrated experience and ability in teaching and evaluating legal research and writing; the proposed syllabus and schedule, and instructor's experience shall be reviewed by the Special Master for each live offering.

The live portion shall include sessions in a facility law library, with written exercises required and returned with comments. Based on a student's performance in class

and on assignments, the instructor shall determine whether the prisoner is minimally competent to assist others. This determination shall be made in writing and provided to the prisoner and to the Special Master.

### E. RESPONSIBILITIES

A Legal Assistant should not undertake or continue to assist another prisoner if, because of workload, inexperience, conflict of interest, or any other factor, he or she cannot do so in an effective and timely manner; any such factor may serve as the basis for denying a prisoner's request for assistance. On occasion, a Legal Assistant should be prepared to respond to an institutional request to assist another prisoner or to assess the viability of a legal claim.

### F. OPERATING PROCEDURES

#### 1. Selecting a Legal Assistant

An updated complete list of Legal Assistants must be regularly available in the law library and housing areas, with all relevant instructions about the Legal Assistant Program including the selection process; this process shall not require disclosure of the requesting prisoner's legal concerns. An agreement between a prisoner seeking assistance and a Legal Assistant will be reported to and recorded in the law library. An ADOC denial because of mistake or ineligibility, or upon finding that these two prisoners cannot be together without creating a serious threat to safety or security, and the opportunity for an alternate selection, shall be provided to the prisoner and to the Legal Assistant within 72 hours of the report to the library; a copy will be held for the Special Master.

A prisoner who is unable to reach agreement with a Legal Assistant or requires a replacement, may seek institutional intervention by filing a request form in the appropriate receptacles. Upon receipt, ADOC shall act to secure the requested assistance in a timely fashion. The institution will be relieved of this responsibility in a particular matter if two Legal Assistants independently conclude after adequate review that the pris-

oner's claim is not viable nor capable of redress by formal legal processes; such responses shall be provided to the Special Master.

#### 2. Meetings

A prisoner shall request a meeting with a Legal Assistant by use of a legal assistance form and receptacle. Legal Assistants may initiate such meetings in the same manner. Provided that other applicable requirements are met, including access equivalent to I(C)(3), ADOC may utilize an alternative method of requesting a meeting when the sole purpose is preparation for a disciplinary hearing. ADOC must arrange a meeting that occurs within 72 hours of a request and notify the prisoner and Legal Assistant in writing of the time and place at least 24 hours prior to the meeting. An imminent legal deadline, including a pending disciplinary hearing, noted on a request requires an expedited meeting occurring within 24 hours of the request by a prisoner or Legal Assistant; II(F)(2) does not otherwise apply to assistance provided solely for a pending disciplinary matter.

ADOC must allow a prisoner to meet at least three hours each week at reasonable times and under reasonable conditions with his or her Legal Assistant; additional time shall be permitted to meet a filing or other legal deadline. Such meetings may occur during law library turnouts; a request by a prisoner or Legal Assistant to have both persons scheduled for a particular turnout shall be given preference. If the library is not requested or available, another location allowing the necessary privacy should be utilized.

A non-contact meeting may be used by ADOC if there is a finding that this is required because of documented security problems attributable to these two prisoners, or if either is in a fully segregated status. The reasons for the non-contact shall be provided to the prisoners in the required meeting notice, and to the Special Master. Any such non-contact meeting shall permit discussion in normal tones, and allow both participants clear sight of each other and of each others legal papers.

Meetings between a prisoner and his or her Legal Assistant shall not be recorded or listened to. A prisoner shall not be given Legal Assistant status nor assigned to provide legal assistance with the objective of providing information to institutional personnel.

### 3. *Library Time*

ADOC shall provide Legal Assistants with additional time in the law library commensurate with their obligations to assist other prisoners. In addition to his or her own hours, a Legal Assistant shall be permitted an additional two hours of library use per week for each prisoner registered as assisting; this may be done at times when the library is not open for general use. The additional hours scheduled for a Legal Assistant may be subtracted from the weekly minimum of the prisoner being assisted.

### 4. *Supplies and Services*

A Legal Assistant may possess and utilize the legal supplies and services available to a prisoner he or she is registered as assisting solely for purposes relating to this assistance. If this prisoner is indigent, the Legal Assistant will be permitted those free legal supplies and services that are provided to indigent prisoners. These supplies and services must first be requested by the indigent prisoner for delivery to the Legal Assistant.

### G. *OTHER PRISONER ASSISTANCE*

Nothing contained herein shall reduce a prisoner's opportunity to consult with any accessible prisoner about a legal matter, nor prohibit any prisoner, consistent with institutional requirements, from providing assistance on legal concerns, including court-related matters and institutional proceedings.

### H. *OUTSIDE LEGAL CONTACTS*

Nothing herein reduces defendants' obligation to facilitate confidential and privileged contacts between prisoners and outside lawyers, authorized paralegals, legal organizations, governmental agencies and courts, through regular visits and adequate use of telephone and mails.

### I. *TELEPHONE CALLS*

Prisoners shall be allowed a weekly minimum of three twenty-minute calls to: (1) an attorney, (2) a designated attorney representative, or (3) a legal organization; additional calls will be permitted in an emergency. ADOC shall install a sufficient number of telephones in each facility to enable these calls during usual business hours. The calls will not be recorded or listened to, and the location of the telephones must permit private conversations.

ADOC may install systems to verify the number called and time used but, absent documented abuse, shall not deny a call to any persons in one of the above three categories nor seek any information about the call. A prisoner may choose to pay for a call or make it collect. Calls that are not completed because of technical problems, or a failure to answer or refusal to accept, do not count. Brief incoming telephone messages involving legal deadlines or other necessary information from an attorney or representative shall be timely delivered to a prisoner.

### III. LEGAL SERVICES AND SUPPLIES

Meaningful access to the courts requires the availability of basic services and supplies needed for research and writing, and for the preparation and delivery of acceptable court papers.

### A. *NOTARY SERVICE*

ADOC must provide notary service for legal papers and court-related documents within 24 hours of a request by a prisoner; this period shall be less if necessary to meet a legal deadline. Absent a legal deadline, this service is not required on weekends or legal holidays. The request may be made in person during a law library turnout or by use of a legal assistance receptacle.

### B. *PHOTOCOPYING*

ADOC must provide the necessary copies of eligible legal papers and court-related doc-

uments within 48 hours of a request by a prisoner; this period shall be less if necessary to meet a legal deadline. The request may be made in person during a law library turnout or by use of a legal assistance receptacle. ADOC may charge a reasonable rate for this service, up to five cents per page.

Eligible legal papers and documents include petitions, complaints, answers, motions, affidavits, exhibits, memoranda and briefs, including attachments and appendices, and material needed for discovery and investigation, including interrogatories and freedom of information requests. ADOC shall advise staff that prisoner legal materials are confidential and may not be read; a clearly visible sign indicating this shall be posted on or next to every copy machine used for legal materials. Each facility shall have such a machine.

## C. *TYPEWRITERS*

Prisoners may possess typewriters and necessary accessories; storage memory is permitted but programming capacity may be denied. ADOC shall provide an adequate number of functioning typewriters in each law library for prisoner use in the preparation of legal papers. This minimally requires a one-to-five ratio of electric typewriters-to-law library capacity; such typewriters must be covered by a service contract or other professional repair system used at the facility.

## D. *SUPPLIES*

Every facility shall have sufficient quantities of basic legal supplies regularly available for purchase by prisoners. Such supplies minimally include pens, pencils, legal pads, typing paper, typewriter ribbons, ko-rec-type or equivalent, file folders, regular size and manila envelopes, postage and brief covers and binders. A reasonable price may be charged for these items, within the departmental guideline of a ten percent above cost maximum mark-up. The prices of all items, legal or otherwise, available for purchase must be publicized prior to ordering by prisoners. Subject to usual security and search procedures, prisoners may receive any basic legal supplies, books, and materials by delivery or mail from outside persons, organizations or businesses.

## IV. INDIGENT PRISONERS

### A. *ELIGIBILITY*

Subject to the requirements contained herein, a prisoner shall be provided basic legal supplies and services at ADOC expense if: (a) he or she has less than $46.00 in the prison account on the date of the request, and (b) there have been less than $46.00 in total deposits to this account in the 28-day period ending on the date of the request. A prisoner who meets (a) but not (b) shall be provided those specific supplies and services required to meet an imminent and documented legal deadline, and a written statement of the costs of these. If this occurs, ADOC may, with written notice to the prisoner, debit the prisoner's account whenever and to the extent that the balance exceeds $46.00 until the cost of the emergency item is repaid.

ADOC shall regularly adjust the above cut-off figure in order to adequately insure a prisoner's access to basic legal supplies and services without sacrificing basic hygiene needs. This adjustment shall occur at least every 24 months beginning the date of the entry of this Order. It shall minimally be the percent change in the U.S. Consumer Price Index for the previous 24 months multiplied by the existing cut-off figure. The resulting new cutoff figure shall be rounded to the nearest fifty-cents.

### B. *SUPPLIES AND SERVICES*

#### 1. *Supplies*

Upon request, the following supplies shall be provided to eligible prisoners; the numbers in parentheses indicate the minimum amount of the item that must be provided for one week: pens (1), pencils (1), typing paper (10 sheets), legal pad (1), file folders (1) and regular envelopes (4). Brief covers and bindings, manila envelopes, and additional amounts of the above supplies shall be provided if necessary to meet a court deadline or requirement. Upon request, an eligible prisoner possessing a typewriter shall also be

provided one suitable typewriter ribbon and one ko-rec-type or equivalent each week.

ADOC may require that the requesting prisoner check the specific items needed for legal research or preparation of legal papers during the next week. Pursuant to Section II(F)(4), the prisoner should indicate which, if any, of the supplies should be delivered directly to his or her Legal Assistant.

### 2. *Postage*

Postage shall be provided for all legal mail for eligible prisoners. Legal mail includes letters and documents sent to a court, to an attorney, to a legal agency or organization, or to a pro se opposing party.

### C. *PHOTOCOPYING*

Eligible prisoners shall be provided the necessary copies of legal papers and court related documents as described in Section III(B). A prisoner shall minimally be provided with the number of copies of a document required by the Court, plus one copy for the opposing party and one for his or her records.

### D. *REQUEST PROCEDURE*

The request procedures and forms shall comply with the applicable requirements of Section I(C). The request may be delivered in person during a law library turnout or placed in the appropriate receptacle. The prisoner should indicate that to his or her knowledge the eligibility requirements are met and which supplies and services are required.

### E. *RESPONSE PROCEDURE*

Law library staff or clerks shall collect the prisoner request forms from each deposit point at least once each day. ADOC shall deliver the requested supplies or services to an eligible prisoner or designated Legal Assistant within 48 hours of the request; this period shall be less if necessary to meet a legal deadline. A prisoner shall be provided written notification of a denial of all or part of his or her request, with the specific reasons, within 48 hours of the request; a copy

will be held for the Special Master. The 48 hour periods do not include weekends or legal holidays.

## V. IMPLEMENTATION

### A. *NOTICE*

Plaintiffs may transmit this Order and Commentary to members of the plaintiff class by mail or bulk delivery of copies to the ADOC and may provide ADOC with additional copies that will be kept on reserve in each law library and made available to prisoners during library turnouts. Plaintiffs or the Special Master may provide ADOC with a summary of this Order which shall be made regularly available in the law library and housing areas.

### B. *SPECIAL MASTER*

All orders concerning the powers, payment and responsibilities of the Special Master, Professor Daniel J. Pochoda, are herein incorporated. Above references to the Special Master include his authorized representatives and Assistant Special Master Janet Bliss.

## COMMENTARY

## I. THE LAW LIBRARIES

Defendants' proposal that existing institutions without law libraries should not be required to build them is reasonable; the significant costs involved are not justified by need. Although not requested, the Proposed Order ("PO") allows ADOC to operate facilities without law libraries if the population is less than 150. Prisoners in the above prisons must get all of the required opportunities (10 hours per week in a law library, timely copies and supplies, legal assistance, etc.). Pending implementation and additional facts, specific size and seating requirements or ratios have not been included. Defendants agreed to address the clearly inadequate library at Santa Rita, ASPC—Tucson (minimum 22 capacity required).

### A. & B. *ACCESS & SCHEDULE*

The PO adopts Defendants' proposal to reduce the total number of weekly library

hours in facilities that do not require advance scheduling for turnouts. Thus, such facilities are only required to maintain a 50 hour per week schedule, as compared to the minimum 84 hours per week at Central Unit; the 50 hours are needed to meet the goal and mandates of the PO.

The PO includes some evening and weekend hours as done now in several facilities (e.g., Gila, Mohave at Douglas). These periods are necessary since most jobs keep prisoners occupied during weekdays (until 3:00 p.m., with dinner at 4:00 p.m.).

The PO also reduces the total time requirements in most facilities that, as Central Unit, require advance scheduling. This was done on the initiative of the Special Master based on an assessment of lesser-capacity institutions (Central Unit housed more than 800).

In every facility—absent emergencies—the library must be actually open and available for prisoner use during the "scheduled" hours. Such use cannot depend on the availability of a particular employee or prisoner clerk (any more than scheduled meals or visiting hours are).

As agreed when formulating the *Gluth* remedy, law library use cannot subject prisoners to unnecessarily onerous or retaliatory practices, including intrusive searches of all visitors or clerks and disciplinary write-ups for any failures to attend; These are occurring in some facilities. Such practices are not used at the maximum security Central Unit or in most facilities. They are generally not required for other congregate activities (classes, jobs, meals, etc.). Unexpected events or suspected threats may require strip searches, and disciplinary action may be necessary if schedules are regularly ignored without explanation. At the Central Unit, reasonable explanations for missed turnouts include scheduling conflict, miscommunication, illness and employee error.

The PO adopts Defendants' proposal to except the SMU—and on the Special Master's initiative other facilities—from the *Gluth* turnout minimums. This is subject to receiving the actual schedules in each prison

and determining their adequacies for all custody levels and housing areas.

### C. *ADVANCE RESPONSE PROCEDURE*

The PO adopts Defendants' proposal to only mandate computers in libraries requiring advanced scheduling.

### G. *LIBRARIAN*

This mandate remains the same as *Gluth* with a "preference" for applicants with a law or paralegal degree. This is necessitated by Defendants' failure to hire any such persons, despite their recognized value. In fact, in its April 1991 Order, the Court specifically noted the need for such expertise and that such persons would reduce total costs to Defendants by their ability to teach the required research courses and to monitor the work of Legal Assistants.

### I. *"CHECK–OUT" SYSTEM*

As was the case in *Gluth*, the PO permits use of a "check-out" system in maximum security facilities. It adopts Defendants' more practical position that this system can—with the necessary showing—be instituted prison-wide, and not only on the person-by-person basis proposed by Plaintiffs. At this time, a check-out system may be used at the Central Unit, CB6 and Special Management Unit facilities.

Direct access to the stacks is required in lesser-security prisons, although reasonable measures may be taken (e.g., limit the numbers in the stacks, assign a clerk to observe and assist). Direct access facilitates adequate research and, given the limited experience of most prisoners, may on occasion be a significant factor. The primary cause of vandalism is addressed by allowing copies of portions of the books and materials available in the library, including cases, laws and forms, for use in the housing area (at the prisoners' expense).

### L. *INVENTORY*

This addition is required by the Court's September 13, 1992 Findings and Conclusions; it closely follows these Findings and

Plaintiffs' proposal. Additional costs attributable to Pacific Reporters are offset by making the Arizona Reporters optional and generally by allowing clearly equivalent (competing) publications.

## II. THE LEGAL ASSISTANCE PROGRAM

### D. *RESEARCH COURSE*

This is an effort to reduce the obligations on and costs to Defendants while still providing the previously adjudicated 60–hour course (at least for law clerks and Legal Assistants). Thus, the PO provides that most of the 60 hours will consist of video taped sessions and that the great majority of prisoners would be limited to these sessions. While there would necessarily be dollar-costs required to prepare this lengthy and difficult tape, it is primarily a one-time expenditure and represents significant savings from the twice-a-year, 60 hour live *Gluth* model.

An effective course for clerks and Assistants requires a live component, including hands-on training in a law library and feedback on written exercises. This component is greatly reduced (to 20 hours) and should allow for Complex-wide offerings. As noted, use of full-time librarians *with* law or paralegal degrees would result in little additional or ongoing costs because of this requirement. ADOC should require that other librarians and library staff take the full course.

### F. 1. *SELECTING A LEGAL ASSISTANT*

The PO incorporates Defendants' proposal that Legal Assistant requests may be denied based on a finding about a security problem.

### 2. *MEETINGS*

The PO incorporates Defendants' request that contact visits may be denied because of security problems. As with library visits, unsupported blanket denials are not permitted (e.g., for an entire facility). There was no showing of necessity in all the prisons listed, and contact visits are used at the maximum security Central Unit. There was no explanation of why prisoners can have "contact" for some purposes but not others (prisoners whose actions/status require complete separation meet the specific showing required by the PO). Courts have recognized that proper—and legal—remedial provisions are often not themselves "constitutional rights".

### I. *TELEPHONE CALLS*

This is required by the Court's Findings and Conclusions. The specifics follow these Findings and Defendants' proposal, with a three call minimum (versus two).

## III. LEGAL SERVICES AND SUPPLIES

### A. *NOTARY SERVICE*

The Defendants' request regarding weekends and holidays is incorporated.

### B. *PHOTOCOPYING*

The sign is required by the Court's Findings.

## IV. INDIGENT PRISONERS

### E. *RESPONSE PROCEDURE*

The PO adopts Defendants' proposal to include legal holidays.